## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PRESQUE ISLE COLON AND RECTAL SURGERY, on Behalf of Itself and All Others Similarly Situated, | |
| Plaintiff, | |
| vs. | CIVIL ACTION NO: ___1:17cv122___ |
| HIGHMARK HEALTH, | |
| -and- | **CLASS ACTION** |
| HIGHMARK INC. f/k/a HIGHMARK HEALTH SERVICES, | **JURY TRIAL DEMANDED** |
| -and- | |
| HIGHMARK CHOICE COMPANY f/k/a KEYSTONE HEALTH PLAN WEST, INC., | |
| Defendants. | |

### CLASS ACTION COMPLAINT

Plaintiff Presque Isle Colon and Rectal Surgery, by and through undersigned counsel (hereinafter "Plaintiff"), on behalf of itself and all persons similarly situated, brings this lawsuit against Defendants Highmark Health, Highmark Inc., and Highmark Choice Company (collectively, "Highmark" or "Defendant"), and complains and alleges as follows based upon personal knowledge, investigation of counsel, and information and belief:

### NATURE OF THE CASE

1.      This is a putative antitrust, breach of contract, and unjust enrichment class action case.  The proposed class is comprised of independent physicians and physician practices in Pennsylvania (collectively, "Independent Pennsylvania Healthcare Practitioners").  Highmark, the largest health insurer in the Commonwealth of Pennsylvania, has abused its market dominance by subjecting Independent Pennsylvania Healthcare Practitioners to anticompetitive and other unlawful practices in relation to services rendered to patients covered by a Highmark health

insurance exchange product. Highmark coerces Independent Pennsylvania Healthcare Practitioners into accepting anticompetitive terms that result in artificially low physician reimbursement rates – i.e., what Highmark pays Independent Pennsylvania Healthcare Practitioners for medical services they render to patients covered by a Highmark health insurance exchange product.

2.      Specifically, Highmark recently unilaterally imposed an across-the-board 4.5% cut in the reimbursement rates Highmark pays Independent Pennsylvania Healthcare Practitioners for medical services rendered to patients covered under a Highmark health insurance exchange product administered under the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18001, *et seq.*, sometimes colloquially referred to as "Obamacare." Highmark unilaterally instituted this 4.5% cut without regard to the quality of care provided to ACA patients. It subsequently implemented additional reimbursement cuts for certain procedures as well.

3.      Highmark's excuse for the 4.5% cut – a vague reference to the company's purported need to recoup unspecified "losses" – is pretextual, and is designed to obfuscate Highmark's true purpose and anticompetitive intent.

4.      First, Highmark has not imposed similar cuts on hospitals, presumably because they may possess countervailing market or negotiating power – unlike Independent Pennsylvania Healthcare Practitioners, who are at Highmark's mercy. Notably, on information and belief, Highmark's 4.5% reimbursement rate cut is the first and only such cut in the nation that any health insurer has ever unilaterally imposed on independent healthcare providers (e.g., those not employed by a hospital) targeted at those who treat patients covered through an ACA product.

5.      Second, Highmark has drastically increased the premiums it charges patients with ACA coverage through Highmark. For example, the average premium increase from 2015 to 2016 for all ACA plans in Pennsylvania was 12%. Highmark, however, increased its premiums by

nearly twice as much, between 20.1% and 21.5%.  For 2017, Highmark set to increase premiums by an astounding 48.1% or more.

6.     Third, Highmark has asserted claims against the United States government seeking to recoup any purported "losses" for covering ACA patients.  According to Highmark's own lawsuit against the United States government, the ACA's "risk corridor" provisions mandate that the federal government will make health insurers whole for losses suffered in connection with ACA health exchange products.

7.     The Secretary for Health and Human Services appears to admit that these payments are due.  The only question is whether they are due immediately (as Highmark contends), or at the end of the risk corridor program in 2017 or later.  Thus, Highmark's excuse about needing to offset its own losses is a complete pretext intended to disguise its true anticompetitive motive – to anticompetitively depress the reimbursement rates it pays to Independent Pennsylvania Healthcare Practitioners.  At a minimum, estoppel principles preclude Highmark from claiming, on the one hand, that it has suffered irrecoverable "losses," while simultaneously pursuing full compensation for those same purported "losses."

8.     Independent Pennsylvania Healthcare Practitioners cannot avoid Highmark's 4.5% cut because they are trapped by Highmark's web of interlocking anticompetitive practices.  For instance, Highmark has inserted an anticompetitive "all products" clause into its standardized form agreement with Independent Pennsylvania Healthcare Practitioners, called a Professional (or Participating or Preferred) Provider Agreement ("PPA").  This coercive clause requires Independent Pennsylvania Healthcare Practitioners to accept *all* of Highmark's health insurance products (including ACA products), and corresponding reimbursement rates (which Highmark unilaterally sets without any negotiation), or else be ineligible for reimbursement under *any* Highmark health insurance product.

9.      As a result, Independent Pennsylvania Healthcare Practitioners cannot afford to stop treating patients covered by a Highmark ACA product in response to the 4.5% reimbursement rate cut, because doing so would mean they would be foregoing reimbursement for treating all other patients with any other type of Highmark coverage. In other words, Highmark forces Independent Pennsylvania Healthcare Practitioners to accept an untenable "all or nothing" proposition – accept all Highmark products and whatever reimbursement rates Highmark arbitrarily chooses to pay, or else forego *all* reimbursement for seeing *any* patients with *any* type of Highmark coverage.  For this very reason, several other states have banned health insurers' use of "all products" clauses.

10.      Highmark's abuse of dominance is best illustrated in the Erie County metropolitan service area ("Erie County MSA").  Highmark has a dominant share of all insured patient lives in the Erie County MSA, in excess of 65-70%.  It has at least as high a share (if not higher) of all patient lives insured under an ACA health exchange product in the Erie County MSA as well. With such a high market share, Independent Pennsylvania Healthcare Practitioners must have a PPA with Highmark else they risk narrowing their potential patient pool by approximately 65-70%.

11.      Conversely, Highmark has at least 65-70% of the market for the purchase of, or reimbursement for, medical services provided in the Erie County MSA.  Due to Highmark's significant market share, Independent Pennsylvania Healthcare Practitioners have no choice but to accept Highmark's unilateral 4.5% reimbursement rate cut for ACA patients, or else forego receiving reimbursement for treating a significant number of other patients with other Highmark coverage.  Accordingly, Highmark has artificially depressed reimbursement rates in Pennsylvania and the Erie County MSA in particular, by virtue of its anticompetitive and/or monopsonistic practices.

12.     In some instances, Highmark's reimbursement cuts and related conduct have effectively reduced the reimbursement amounts for medical services (such as certain screening or preventative measures) required to be covered under the ACA to zero or almost zero. That is, while Highmark claims technical compliance with the ACA by asserting it "covers" certain services, in practice, Highmark does not actually reimburse Independent Pennsylvania Healthcare Practitioners for such services (or reimburses at such slow rates that Independent Pennsylvania Healthcare Practitioners essentially receive no money).

13.     Highmark's conduct, alleged more fully herein, violates federal statutory antitrust laws and Pennsylvania common law.

14.     Further, Highmark's conduct breaches the PPAs it has forced Independent Pennsylvania Healthcare Practitioners to accept.  Each PPA incorporates the ACA, and the ACA prohibits discrimination in reimbursement rates on any basis besides quality or performance measures.  Here, Highmark admits that its 4.5% reimbursement rate cut is based on a (pretextual) reason entirely unrelated to quality or level of care provided to ACA patients.

15.     Highmark's conduct also constitutes a breach of the implied covenant of good faith and fair dealing, and unjust enrichment under Pennsylvania law.

16.     Plaintiff therefore brings this action on behalf of itself and similarly situated Independent Pennsylvania Healthcare Practitioners asserting that Highmark's anticompetitive and other conduct violates federal and state laws.

## PARTIES

17.     Plaintiff Presque Isle Colon and Rectal Surgery is, and at all times relevant hereto was, a citizen and resident of Erie County, Pennsylvania.  Presque Isle Colon and Rectal Surgery is a party to a PPA with Highmark, and renders medical care to patients covered by a Highmark-administered ACA healthcare plan.

18.     Defendant Highmark Health is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  Highmark Health does business throughout Pennsylvania and elsewhere, including through a variety of affiliates and subsidiaries.

19.     Defendant Highmark Inc. f/k/a Highmark Health Services is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  Highmark Inc. does business throughout Pennsylvania and elsewhere, including through a variety of affiliates and subsidiaries.  It also does business as Highmark Blue Cross Blue Shield or Highmark Blue Shield in Pennsylvania.

20.     Defendant Highmark Choice Company f/k/a Keystone Health Plan West, Inc. is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  Keystone Health Plan West, Inc. is an affiliate and subsidiary of Highmark, Inc. and/or Highmark Health, and does business throughout Pennsylvania.

## JURISDICTION AND VENUE

21.     This complaint is brought pursuant to, among other things, Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, *et seq*., and Pennsylvania common law.

22.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, as well as 15 U.S.C. §§ 15 and 26.

23.     This Court has personal jurisdiction over Highmark because it systematically and continuously transacts substantial business in Pennsylvania.

24.     At all relevant times, Highmark employed various devices to commit illegal acts described herein, including U.S. mail, interstate travel, interstate telephone communications, and interstate commerce.  Highmark's complained-of activities occurred within the stream of, and have substantially affected, state and interstate commerce.

25.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Highmark can be found and transacts business in this District, and a substantial part of the interstate trade, commerce, events, and omissions giving rise to this action occurred in this District. Further, Plaintiff resides in this District, and was injured and subjected to irreparable harm in this District.

## FACTUAL ALLEGATIONS

### A.     Highmark's Professional Provider Agreements

26.     Highmark forces any Independent Pennsylvania Healthcare Practitioner who renders medical care to a patient covered by Highmark health insurance, and who has an expectation of being reimbursed for rendering such care, to agree to Highmark's Professional (or Participating or Preferred) Provider Agreement (PPA).  The PPA is a standard form contract drafted by Highmark.  Highmark will not reimburse a Pennsylvania Healthcare Practitioner who does not sign a PPA.  An example of the Highmark PPA are attached as Exhibit A (Highmark PPA with Presque Isle Colon and Rectal Surgery).

27.     Highmark does not negotiate any terms of the PPA with Independent Pennsylvania Healthcare Practitioners.  Similarly, Highmark does not negotiate the reimbursement rates it will pay Independent Pennsylvania Healthcare Practitioners for rendering medical care to Highmark-covered patients; because of its market dominance in providing coverage to patients, it has no need to negotiate.  Highmark simply thrusts the PPA, and whatever reimbursement rates it feels like paying, upon Independent Pennsylvania Healthcare Practitioners.  Highmark does not disclose its reimbursement rates to Independent Pennsylvania Healthcare Practitioners at the time it forces an Independent Pennsylvania Healthcare Practitioner to accept the PPA.  Even after a PPA is signed, Highmark continues to obfuscate the process by which it determines reimbursement rates, and how much it will reimburse for a particular procedure.

28.     Highmark does not even provide copies of the signed PPAs to Independent Pennsylvania Healthcare Practitioners in all instances, unless the Pennsylvania Healthcare Practitioner requests such in writing.  *See* Ex. A at Appendix I, § 7.7.

**1.     Highmark's PPA Includes an "All Products" Clause**

29.     The PPA contains an "all products" clause, which forces Independent Pennsylvania Healthcare Practitioners to accept patients with any Highmark insurance – including ACA coverage – or none at all.  The PPA reads as follows: "**Network Product Participation.**  Provider must and, where applicable, must ensure that all Practitioners participate in all Network Products covered under this Agreement[.]"  Ex. A at § 4.1 (emphasis original); *see also* Ex. A at Part I, § 4.1 (same).

30.     By virtue of Highmark's "all products" clause, Independent Pennsylvania Healthcare Practitioners face a Hobbesian choice – they either can accept (without any negotiation) Highmark's unilaterally-selected reimbursement rates (which are not disclosed when Highmark presents the PPA to a Pennsylvania Healthcare Practitioner) for patients covered under each and every Highmark health insurance product, or risk being ineligible to receive any reimbursement for any medical services rendered to any Highmark-covered patient.

31.     Health insurance companies' use of "all products" clauses has long been the subject of scrutiny because of their anticompetitive effect.  For instance, various states including Alaska, Maryland, and Virginia have essentially banned all products clauses, while Nevada's insurance commissioner issued a bulletin more than a decade ago indicating that all products clauses are coercive and violate the state's unfair trade practices act.

32.     In addition, as part of a settlement in a long-running lawsuit against over 40 Blue Cross and Blue Shield plans alleging civil RICO and other violations, *See Love, et al. v. Blue Cross & Blue Shield Assoc., et al.*, No. CV-03-21296 (S.D. Fla.), health insurers (including Highmark)

agreed not to use a number of contractual provisions, including all products clauses.  The *Love* settlement has since expired.  Although some health insurers subsequently did not re-insert all products clauses into their agreements with healthcare practitioners, and others never used them to begin with, Highmark has seen fit to continue to use these anticompetitive clauses.

### 2.     Highmark's PPA Incorporates Federal and State Law

33.     Highmark's PPAs with Independent Pennsylvania Healthcare Practitioners also expressly incorporates, among other things, all federal and state law.

34.     Specifically, the PPA defines "Law" or "Laws" as "any applicable foreign, United States, federal, state and/or local constitution, treaty, statute, regulation, code, ordinance, order, policy, directive, injunction, write, decree, award of the like of any Official Body that is then in effect."  Ex. A at Attachment 1, § 2.Q.  Highmark further warrants in the PPAs that it will render payments "in accordance with the terms and conditions of applicable Laws."  Ex. A at § 6.2; *see also id.* at § 7.1.

35.     The PPA further provides that, in the event of a conflict in interpretation, the PPA is governed "first, [by] applicable Laws."  Ex. A, at Attachment 9.15(a), § 6; *see also id.* at Attachment 1, § 2.

### B.     Highmark's Unilateral 4.5% Reimbursement Rate Cut For Independent Pennsylvania Healthcare Practitioners Who Treat ACA Patients With Highmark Coverage

### 1.     Overview of the ACA

36.     The Patient Protection and Affordable Care Act (the "ACA"), sometimes colloquially referred to as "Obamacare," was signed into law in 2010.  A principal focus of the ACA is on the quality of healthcare for Americans.  To this end, the ACA contains a number of provisions relating to identifying, measuring, and encouraging quality medical care that leads to positive patient outcomes.

37.     In accordance with the ACA, the Pennsylvania Insurance Exchange Marketplace ("Pennsylvania Marketplace") is administered by the United States Department of Health and Human Services ("HHS") on Pennsylvania's behalf.  The Pennsylvania Marketplace essentially is a marketplace for individuals to shop for health insurance if they do not already have health insurance coverage from another source.

38.     Health insurance companies are able to seek or bid for approval to be a Qualified Health Plan ("QHP") eligible to offer plans to consumers through the Pennsylvania Marketplace.

39.     Highmark operates and offers one or more QHPs through the Pennsylvania Marketplace, and has done so since the Pennsylvania Marketplace's inception.

**2.     Highmark's Unilateral, Across-The-Board 4.5% Reimbursement Cut**

40.     On or about February 12, 2016, Highmark announced that, effective April 1, 2016, it would unilaterally reduce fees it reimbursed to Independent Pennsylvania Healthcare Practitioners for all services rendered to patients covered by any Highmark QHP by 4.5%.

41.     Highmark did not give Independent Pennsylvania Healthcare Practitioners sufficient notice about the 4.5% cut.  Highmark also did not negotiate with Independent Pennsylvania Healthcare Practitioners the 4.5% cut in any way.

42.     Moreover, Highmark's 4.5% reduction was untethered to the quality of care provided to any ACA patient covered under a Highmark QHP.

43.     The Pennsylvania Medical Society's and others' efforts to engage Highmark in a meaningful dialogue were rebuffed.  The Pennsylvania Medical Society, for instance, wrote to Highmark on February 26, 2016, requesting that Highmark rescind the latter announced fee reduction.  The Pennsylvania Medical Society also requested a meeting between Highmark and itself, along with other affiliated groups, to discuss the cut and possible remediation.  In its letter, Pennsylvania Medical Society noted, among other things, that "this meeting should have been held

prior to the receipt of [Highmark's] letter to discuss options before such a drastic step was taken by one of the largest providers of health insurance in the Commonwealth."

44.     Although Highmark eventually did meet with the Pennsylvania Medical Society, Highmark refused to reduce or eliminate its previously announced 4.5% cut.  On or about May 12, 2016, the Pennsylvania Medical Society declared that it had reached an impasse with Highmark. Other organizations or interested parties also attempted to negotiate the 4.5% cut with Highmark, but to no avail.

**3.     Highmark's Pretextual Excuse For Its Unilateral 4.5% Cut**

45.     Highmark claimed its 4.5% cut was necessary to recoup unexpected losses it suffered in 2014 and 2015 for covering ACA patients under Highmark QHPs available through the Pennsylvania Marketplace.

46.     Highmark's explanation was blatantly false and masked its true anticompetitive purpose behind its 4.5% cut – to coerce Independent Pennsylvania Healthcare Practitioners to accept artificially reduced or predatory reimbursement rates.

47.     Highmark's excuse is pretextual because, among other things, it will recoup its purported losses by operation of federal law.

48.     Specifically, on May 17, 2016, Highmark filed a lawsuit against the United States for payment of "mandatory risk corridor payment obligations" mandated by the ACA.  *See First Priority Life Ins. Co., Inc., et al. v. United States*, Civ. 16-587 C (Fed. Ct. Cl. May 17, 2016).

49.     In its *First Priority* lawsuit, Highmark alleges that the ACA's "mandatory risk corridor payment obligations" require the United States to pay Highmark the difference between the premiums it collects and its insured life expenditures for three years – 2014, 2015, and 2016.

50.     Highmark contends the mandatory risk corridor payment obligations were the carrot envisioned under the ACA to entice health insurers to participate in the ACA's health insurance exchange marketplaces.  As Highmark itself puts it:

> Congress intended the ACA's temporary risk corridors provision as an important safety valve for consumers and insurers as millions of Americans would transition to new coverage in a brand new Marketplace; protecting against the uncertainty that health insurers, like Plaintiffs, would face when estimating enrollments and costs resulting from the market reforms by creating a mechanism for sharing risk between the federal government and issuers of QHPs in each of the first three years of the marketplace.

51.     Highmark's lawsuit makes clear there is little doubt this money is owed to Highmark.  As Highmark references in its *First Priority* complaint, HHS acknowledged in an October 8, 2015 letter to Highmark that payments are due to Highmark under the ACA's risk corridor provisions:  "I wish to reiterate to you that the Department of Health and Human Services (HHS) recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers[.]"  HHS has apparently taken the position, however, that the risk-corridor payments are owed in 2017 – when the provisions expire – or later, not immediately.

52.     The United States Department of Justice has recently reiterated this position on behalf of the United States government in a similar lawsuit brought by another healthcare insurance company also seeking risk-corridor payments.  In the government's brief filed on June 24, 2016 in *Health Republic Insurance v. United States of America*, No. 16-259 C (Fed. Ct. Cl.), the United States wrote:

> The policy issues presented by this case are complex, but the legal principles requiring its dismissal are straightforward.
>
> First, Health Republic has no claim to 'presently due' money damages…Section 1342 of the Affordable Care Act does not define a deadline by which risk corridor payments must be made, and HHS, in its discretion, established a three-year payment framework…Under this framework, HHS cannot owe Health

-12-

Republic, or any other issuer, final payment before the end of the program cycle in 2017.

53.     Similarly, in April 2017, the United States government stated in a supplemental brief filed in Highmark's *First Priority* lawsuit:  "final risk corridors payments are not presently due under the Department of Health and Human Services' ("HHS") three-year payment framework."  Further, "because under HHS's three-year payment framework ***Highmark will likely receive additional payments***, its claims are not ripe" (emphasis added).

54.     The question, therefore, is not *if* Highmark will be compensated by the United States for Highmark's purported losses for insuring patients covered under Highmark's QHPs, but rather *when* such payments will be made.   Highmark's excuse for cutting Independent Pennsylvania Healthcare Practitioners' reimbursement rates by 4.5%, therefore, is a complete fabrication, given that Highmark knows and believes it will receive risk corridor payments from the federal government.

55.     Highmark's excuse is illusory for the additional reason that the company has already drastically increased the premiums it charges individuals insured by a Highmark QHP. For instance, for 2016, Highmark's First Priority QHP announced a 21.5% increase in premiums. Highmark's HM Health Insurance QHP announced a staggering 26.2% increase.  At the same time, other Blue Cross & Blue Shield plans in Pennsylvania were granted rate increases of less than 5% by the Pennsylvania Insurance Department for individual products sold in the Pennsylvania Marketplace.  The average approved premium increases in Pennsylvania across all QHPs available to individuals for 2016 was 12%.  Highmark's average increase was between 20.1% to 26.2%.  For 2017, Highmark set to increase premiums by up to an astounding 48.1% or more.  In other words, Highmark's premium increases are basically double those of other health insurers offering QHPs through the Pennsylvania Marketplace.  Highmark's purported need to recoup "losses" – which will be remedied through the risk corridor payments in any event – has already been addressed

through premium increases.  Highmark's predatory 4.5% reduction of reimbursement rates for Independent Pennsylvania Healthcare Practitioners did not take into account to Highmark's premium increases, or any risk corridor payments.

56.     Essentially, Highmark has anticompetitively rigged a win-win situation for itself, at the expense of Independent Pennsylvania Healthcare Practitioners.  By exploiting its market position, Highmark has artificially deflated its own payment obligations by cutting Independent Pennsylvania Healthcare Practitioners' reimbursement rates, while at the same time Highmark has increased the monies owed to itself by raising premiums, and also knows it is owed risk corridor payments.

## C.     Highmark's Actions Are Anticompetitive

57.     Highmark's one-sided agreements and coercive or predatory reimbursement rates, and related practices, have injured competition and Independent Pennsylvania Healthcare Practitioners.

### 1.     Highmark's Unilateral 4.5% Reimbursement Cut Is Anticompetitive

58.     Highmark is one of the largest health insurers in the Commonwealth of Pennsylvania, with more than 4 million covered lives statewide. Of those, at least 100,000 are insured under one of Highmark's QHPs.

59.     Because of the coercive and anticompetitive nature of Highmark's "all products" clauses in their PPAs, Independent Pennsylvania Healthcare Practitioners practically have no choice but to accept Highmark's anticompetitive terms and suffer whatever rates Highmark arbitrarily thrusts upon them, or else forego treating any patient covered by any Highmark health insurance product.  This includes accepting the 4.5% reimbursement rate cut thrust upon them by Highmark.

60.     Indeed, Highmark has not as brazenly sought to impose monopsonistic reimbursement rate cuts upon hospitals, presumably because these entities may or tend to possess countervailing market power, bargaining power, or leverage – or worse yet, Highmark owns a substantial or controlling interest them.   By contrast, Independent Pennsylvania Healthcare Practitioners lack sufficient negotiating power.   Highmark has obliquely admitted this.   For instance, in an April 1, 2016 letter from the President of Highmark to the President of the Pennsylvania Academy of Dermatology and Dermatologic Surgery, Highmark stated that it cannot unilaterally reduce reimbursement rates paid to hospitals, as it has done with Independent Pennsylvania Healthcare Practitioners, because Highmark must address reimbursement through individual negotiations and contracts with each hospital.

## 2.     Highmark's Anticompetitive Conduct Has Especially Harmed Competition and Independent Pennsylvania Healthcare Practitioners in the Western Pennsylvania and Erie Areas

61.     Highmark's anticompetitive practices alleged herein have especially impacted competition and Independent Pennsylvania Healthcare Practitioners in Western Pennsylvania and the Erie Metropolitan Statistical Area ("Erie County MSA").

62.     There is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical services rendered to covered patients, in the 29-county Western Pennsylvania area (as defined by Highmark),[1] and within that area the Erie County MSA in particular.

63.     Highmark's market share in the market for the provision of health insurance coverage to patients, as well as for the purchase or reimbursement of medical services rendered to

---

[1] This area includes Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, part of Centre, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland counties.

covered patients, in the Western Pennsylvania area is at least 55% or more.  In the Erie County MSA, Highmark's market share is at least 70% or more.

64.     In addition, Highmark's market share in the markets (or sub-markets) for provision of health insurance coverage to patients, and the purchase or reimbursement of medical services rendered to patients, covered under a QHP is approximately the same (i.e., at least 55% in Western Pennsylvania and at least 70% in the Erie County MSA).

65.     Accordingly, Highmark possesses a dominant, monopolistic or monopsonistic share in these markets in the 29-county Western Pennsylvania area, and within that area the Erie County MSA in particular.

66.     Highmark has directly and unlawfully exercised market or monopsony power[2] in Western Pennsylvania and the Erie County MSA by artificially depressing the reimbursement rates for Independent Pennsylvania Healthcare Practitioners in these areas for medical services rendered to patients covered by a Highmark health insurance product by Independent Pennsylvania Healthcare Practitioners.

67.     Independent Pennsylvania Healthcare Practitioners in Western Pennsylvania or the Erie County MSA cannot turn to other health insurers because of Highmark's dominant market position.  Highmark covers such a significant number of actual and potential patients in each of these areas that Independent Pennsylvania Healthcare Practitioners in Western Pennsylvania or the Erie County MSA would not be able to forego treating (and receiving reimbursement for) patients covered by a Highmark health insurance product.  Such an option is not economically viable for

---

[2] Monopsony power (substantial power on the buy-side of a market, i.e., the ability to exercise market power to reduce the prices paid for a product or service) is the mirror image of monopoly power (substantial power on the sell-side of a market, i.e., the ability to exercise market power to raise the prices charged for a product or service).

Independent Pennsylvania Healthcare Practitioners in Western Pennsylvania or the Erie County MSA.

68.     Independent Pennsylvania Healthcare Practitioners in Western Pennsylvania and the Erie County MSA cannot turn to patients or health insurers outside these areas.  The medical services they render are localized, insofar as patients outside Western Pennsylvania or the Erie County MSA are unlikely to travel into these areas for medical care due to the time and effort involved.  Similarly, Independent Pennsylvania Healthcare Practitioners practicing in Western Pennsylvania or the Erie County MSA rely on referral networks or hospital staff privileges, which are focused within these areas.  In short, Independent Pennsylvania Healthcare Practitioners within Western Pennsylvania and the Erie County MSA cannot practicably turn to any other alternate source of patients or reimbursements besides Highmark-covered patients within Western Pennsylvania and the Erie County MSA.  Similarly, patients within these areas cannot practicably turn to other insurers because of the scope and breadth of Highmark's networks.

69.     Significant barriers also insulate Highmark from any meaningful or vigorous competition within Pennsylvania generally, as well as within Western Pennsylvania and the Erie County MSA.  For example, existing health insurers operating in the Erie County MSA besides Highmark have not meaningfully expanded within the geographic market (if at all), and do not intend (or do not have the ability, due to Highmark's market dominance) to do so.  Moreover, an additional barrier to offering ACA coverage in Western Pennsylvania and the Erie County MSA to compete against Highmark's ACA coverage is that a health insurer must meet federal standards to offer a QHP before it can market such a plan to patients and, in turn, before it can reimburse Independent Pennsylvania Healthcare Practitioners for seeing ACA patients.  In short, Independent Pennsylvania Healthcare Practitioners throughout the Commonwealth, but in Western Pennsylvania and the Erie County MSA in particular, are essentially captive to Highmark, and lack

any other realistic choice but to accept Highmark's artificially low reimbursement rates that Highmark chooses to monopsonistically impose upon them.

**D.    Highmark's Unilateral Reimbursement Cut Is Part of Highmark's Broader Anticompetitive Scheme In Pennsylvania**

70.    Highmark's unilateral reduction in reimbursement rates, and abuse of the coercive "all products" clauses in its PPAs, are just the latest acts in furtherance of Highmark's scheme to exploit Independent Pennsylvania Healthcare Practitioners and to suppress reimbursement rates in Pennsylvania.

71.    Highmark has engaged in various other exclusionary and anticompetitive practices to exploit Independent Pennsylvania Healthcare Practitioners.

72.    For instance, Highmark owns a substantial or controlling interest in Saint Vincent Hospital, the largest hospital in the Erie County MSA.  Highmark coerces employed or affiliated healthcare providers at Saint Vincent Hospital not to steer or send patients to Independent Pennsylvania Healthcare Practitioners, because of the latter's independent status (and even if they are within Highmark's provider networks).  Instead, Highmark pressures employed or affiliated healthcare providers, such as those at Saint Vincent Hospital, to steer patients to internal, affiliated healthcare providers, without regard to whether they will receive better or more affordable care.

73.    Highmark also unfairly exerts market pressure on Independent Pennsylvania Healthcare Practitioners to change or reduce medical services rendered to covered patients, or to utilize different procedures (and related procedure codes), without requiring the same for employed or affiliated healthcare providers such as those at Saint Vincent Hospital.  By doing so, Highmark not only interferes with Independent Pennsylvania Healthcare Practitioners' rendering of medical care to patients, but its interference often results in delaying medical services, reducing the quality of medical services, or costing patients more money for medical services rendered by Independent Pennsylvania Healthcare Practitioners.

74.     Highmark also unfairly abuses its dominant market position by subjecting Independent Pennsylvania Healthcare Practitioners to an unusually high number of audits and other administrative reviews, which disrupt the latter's businesses and provision of medical services.

75.     Moreover, Highmark has reduced the amounts it reimburses Independent Pennsylvania Healthcare Practitioners for certain mandated procedures (including screening and preventative procedures that benefit patients in the long-term), to essentially zero; implemented inefficient procedure codes or other practices; refuses to negotiate reimbursement rates and related terms; and avoids making reimbursement adjustments for cost-of-living or inflation.

76.     Highmark's scheme has resulted in inefficiencies for Highmark-covered patients seeking care from Independent Pennsylvania Healthcare Practitioners, and has adversely impacted Independent Pennsylvania Healthcare Practitioners.

77.     Highmark has also cloaked the process by which it sets and pays reimbursement rates in secrecy to obscure its anticompetitive aims.   Indeed, Highmark often changes reimbursement rates for particular procedures with little to no warning or explanation, and without tethering such changes to market conditions, competitive market forces, or quality of care.

78.     Additionally, on information and belief, Highmark coerces employers into accepting Highmark health insurance products, and dissuading use of competitors' products, so Highmark can maintain or expand its dominant market position.

79.     Highmark has further threatened to utilize its extraordinary and excessive "reserves" (almost $5 billion) to enter (and have already done so in some cases) the market as providers of healthcare services if Independent Pennsylvania Healthcare Practitioners do not acquiesce to the far below market rates and other anticompetitive terms. All of this is undertaken

in an attempt to further drive down payment rates to Pennsylvania Healthcare Providers and to raise barriers for competing firms to enter these markets.

80.     Highmark's conduct has dissuaded would-be competitors from outside Pennsylvania to enter into, expand within, or compete within Pennsylvania.

81.     In addition, Highmark has a long-stranding arrangement with Independent Blue Cross ("IBC"), which principally serves the southeastern part of Pennsylvania.  Through licensing and joint-operating arrangements relating in part to the "Blue Cross" and "Blue Shield" trademarks, Highmark and IBC do not meaningfully compete with each other geographically in Pennsylvania.  Because of this, IBC principally operates in Southeastern Pennsylvania only, whereas Highmark does not materially compete there.  Conversely, Highmark principally operates throughout the rest of Pennsylvania (including by virtue of its acquisition of Blue Cross of Northeastern Pennsylvania), whereas IBC does not.

82.     Together, Highmark and IBC are two of the largest health insurers in Pennsylvania, and have a substantial combined market share of all covered patients (and share of the purchase or reimbursement of medical care rendered by Independent Pennsylvania Healthcare Practitioners to covered patients) in Pennsylvania, well in excess of 70%.  Individually, and in their respective areas, Highmark and IBC each have market dominance.

83.     While this lawsuit does not specifically challenge the geographic allocation and related arrangements between Highmark and IBC, the fact remains that these arrangements effectively magnify Highmark's market share in the areas within which it does business.  That is, Highmark's statewide market share of the market for the provision of health insurance coverage, as well as for the purchase or reimbursement of medical care rendered to covered persons, is closer to at least 50% or more once the fact that Highmark and IBC do not vigorously compete against each other is taken into account.

**D.     Highmark's Unilateral 4.5% Reimbursement Rate Cut Violates Its PPAs With Independent Pennsylvania Healthcare Practitioners**

84.     The ACA contains an anti-discrimination provision, which specifically prohibits a health insurer such as Highmark from altering reimbursement rates for reasons other than quality or performance measures.  Section 2706 of the ACA reads (emphases added):

> *A group health plan and a health insurance issuers offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law.*  This section shall not require that a group health plan or health insurance issuer contract with any health care provider willing to abide by the terms and conditions for participation established by the plan or issuer.  *Nothing in this section shall be construed as preventing a group health plan, a health insurance issuer, or the Secretary from establishing varying reimbursement rates based on quality or performance measures.*

85.     Senator Thomas Harkin, a member of the Senate Health, Education, Labor and Pensions Committee and the primary sponsor of Section 2706, has underscored Congress's intent in drafting this section.  In a July 11, 2013 congressional report, Senator Harkin responded to whether the ACA prohibits price discrimination based on "market considerations."  He noted that "Section 2706 was intended to prohibit exactly these types of discrimination [based on market considerations]."

86.     Highmark's PPAs with Independent Pennsylvania Healthcare Practitioners also expressly incorporates, among other things, all federal law – including the ACA.  The PPA defines "Law" or "Laws" as "any applicable foreign, United States, federal, state and/or local constitution, treaty, statute, regulation, code, ordinance, order, policy, directive, injunction, write, decree, award of the like of any Official Body that is then in effect."  Ex. A at Attachment 1, § 2.Q.  Highmark warrants in the PPAs that it will render "in accordance with the terms and conditions of applicable Laws."  Ex. A at § 6.2; *see also id.* at § 7.1.  The PPA further provides that, in the event of a

conflict in interpretation, the PPA is governed "first, [by] applicable Laws." Ex. A, at Attachment 9.15(a), § 6; *see also id.* at Attachment 1, § 2.

87.    Accordingly, the PPA expressly incorporates federal law, including the ACA. The PPA also states that any conflicts in interpretation defer to federal law first. Thus, Highmark's anticompetitive conduct not only violates federal and state antitrust principles, but also constitutes a breach of the PPA insofar as Highmark has instituted an impermissible reimbursement rate cut for services rendered to ACA patients, which Highmark has admitted was not based on any performance or quality measure.

**E.    Plaintiff's Experiences**

88.    Plaintiff has been victimized, along with other Class members, by Highmark's anticompetitive and other unlawful practices.

89.    Presque Isle Colon and Rectal Surgery entered into a PPA with Highmark in or about August 2011. *See* Ex. A.

90.    Since Highmark's announcement last year, Presque Isle Colon and Rectal Surgery has experienced a 4.5% reimbursement rate cut for covered medical services rendered to patients covered under a Highmark QHP. Presque Isle Colon and Rectal Surgery was unable to negotiate Highmark's unilaterally-imposed reimbursement rate cuts, and has no choice but to accept them because such as high percentage of its patients and other potential patients are covered under one or more of Highmark's insurance products. Presque Isle Colon and Rectal Surgery has also had to accept Highmark's unilateral reimbursement rate reductions for services covered under other Highmark health insurance products.

91.    Presque Isle Colon and Rectal Surgery has been the target and victim of Highmark's other coercive and exclusionary practices discussed herein. For instance, because Presque Isle Colon and Rectal Surgery has refused to become an employee or affiliate of Highmark-controlled

Saint Vincent Hospital, Highmark has coerced healthcare providers at Saint Vincent Hospital to steer patients away from Presque Isle Colon and Rectal Surgery.

92.     Similarly, Highmark has attempted to coerce Presque Isle Colon and Rectal Surgery into performing different medical services for covered patients than those Presque Isle Colon and Rectal Surgery believes are in the best interest of the patients, or which might cost the patients less money.

93.     Furthermore, Highmark has audited Presque Isle Colon and Rectal Surgery's procedures and diagnostic codes, or referrals, at a rate much higher than non-independent healthcare providers without any justifiable medical or other basis.  Rather, Highmark has done this to pressure Presque Isle Colon and Rectal Surgery into relinquishing or referring patients to Highmark-employed or Highmark-affiliated healthcare providers.

94.     In addition, Highmark has reduced the money it reimburses Presque Isle Colon and Rectal Surgery for services that must be covered under the ACA, such as certain screening and preventative procedures, to essentially zero.  Further, the rates at which Highmark reimburses Presque Isle Colon and Rectal have never been open to negotiation, and have never been adjusted for cost-of-living increases or inflation.

95.     Presque Isle Colon and Rectal Surgery has tried multiple times to discuss or negotiate reimbursement and related issues with Highmark, but was rebuffed in each instance.

## CLASS ALLEGATIONS

96.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and on behalf of the following proposed classes:

> The Pennsylvania State Class:  All independent physicians and physician practices in Pennsylvania who treat patients covered by a Highmark health insurance exchange product.

> The Western Pennsylvania Subclass:  All independent physicians and physician practices in Highmark's 29-county Western Pennsylvania area who treat patients covered by a Highmark health insurance exchange product.

> The Erie Subclass:   All independent physicians and physician practices in the Erie Metropolitan Statistical Area who treat patients covered by a Highmark health insurance exchange product.

Collectively, these are referred to as the "Class" or "Classes."

97.     Excluded from the Class are (i) governmental entities, (ii) Highmark and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, assigns, and entities in which Highmark has a controlling interest; and (iii) the judge, justices, magistrates or judicial officers presiding over this matter.

98.     Said definitions may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

99.     *Numerosity*.  The members of the Class are so numerous that separate joinder of each member is impracticable.  Plaintiff does not know the exact number of members in the Class, but based upon information and belief, Plaintiff reasonably believes that Class members number at a minimum in the thousands.

100.     *Commonality*.  The claims of Plaintiff raise questions of law or fact common to the questions of law or fact raised by the claims of each member of the Class.  Plaintiff's claims arise from the same practice or course of conduct that gives rise to the claims of the Class members. The questions of law and fact common to Plaintiff and the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

- Whether Highmark's conduct constitutes an illegal restraint of trade in violation of Section 1 of the Sherman Act and/or Pennsylvania antitrust common law;
- Whether Highmark's conduct constitutes a violation of Section 2 of the Sherman Act and/or Pennsylvania antitrust common law;
- Whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Highmark's power to control price or exclude competition;

- If a relevant market needs to be defined, the definition of the relevant market for analyzing Highmark's monopsony power, and whether Highmark had monopsony power in the relevant market;

- Whether Highmark's conduct constitutes a breach of contract, or breach of the implied covenant of good faith and fair dealing;

- Whether Highmark's conduct constitutes unjust enrichment; and

- Whether Plaintiff and the Class have been injured as a result of Highmark's conduct, and the amount of damages.

101.  *Typicality.*  The claims of Plaintiff are typical of the claims of each member of the Class.  Highmark engaged in a standardized course of conduct affecting the Class members, and Plaintiff's alleged injuries arise out of that conduct.  All Class members, including Plaintiff, have the same or similar injury to their property as a result of Highmark's anticompetitive conduct.

102.  *Adequacy.*  Plaintiff can fairly and adequately protect and represent the interests of each member of the Class.  Plaintiff fits within the class definition and their interests do not conflict with the interest of the members of the Class they seek to represent.  Plaintiff is represented by experienced and able attorneys.  The undersigned Class Counsel have litigated numerous class actions and complex cases and intend to prosecute this action vigorously for the benefit of the entire Class.  Plaintiff and Class Counsel can and will fairly and adequately protect the interests of all members of the Class.

103.  *Predominance.*  Common issues predominate. As set forth in detail above, common issues of fact and law predominate because all of Plaintiff's claims are based on identical anticompetitive conduct.

104.  *Superiority.*  Additionally, a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each Class Member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Highmark's conduct.  It would be virtually impossible for the members of the Class to effectively redress the wrongs done to them on an individual basis.  Even

if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.

105.    Highmark acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Highmark.

106.    Injunctive relief is necessary to prevent further anticompetitive conduct by Highmark.  Money damages alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Highmark from continuing to engage in conduct which restrains, suppresses, and/or eliminates competition in Pennsylvania.

107.    The trial and litigation of Plaintiff's claims are manageable.  Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims and the legal and factual issues presented by Highmark's conduct based upon a single set of proof in just one case.

108.    Further, Highmark has acted on grounds generally applicable to the Class, thereby making final injunctive relief with respect to the Class as a whole appropriate. Moreover, on information and belief, Plaintiff alleges that the conduct complained of herein is substantially likely to continue in the future if an injunction is not entered.

109.    *Notice to the Class.*  Notice to the Class may be made by publication and/or other practicable means, including notice accomplished by use of Highmark's own reimbursement database(s) and other records.

## COUNT ONE
**(Unlawful Restraint of Trade – *Per Se* Violation of Section 1 of the Sherman Act)**

110.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

111.    Highmark has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade in violation of 15 U.S.C. § 1, including Highmark's PPA contracts with Independent Pennsylvania Healthcare Practitioners that contain "all products" clauses.

112.    Highmark's agreements, combinations, or conspiracies, individually and collectively, are unlawful *per se* under Section 1 of the Sherman Act.

113.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

114.    Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

115.    As a direct and proximate result of Highmark's continuing violation of Section 1 of the Sherman Act, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a classwide basis, and should be trebled under Section 4 of the Clayton Act.  *See* 15 U.S.C. § 15.

116.    Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

## COUNT TWO
### (Unlawful Restraint of Trade – *Per Se* Violation of Pennsylvania Common Law)

117.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

118.    Highmark has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade in violation of Pennsylvania common law, including Highmark's PPA contracts with Independent Pennsylvania Healthcare Practitioners that contain "all products" clauses.

119.    Highmark's agreements, combinations, or conspiracies, individually and collectively, are unlawful *per se* under Pennsylvania common law.

120.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

121.    Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

122.    Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

123.    As a direct and proximate result of Highmark's continuing violation of Pennsylvania common law, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a classwide basis, and should be trebled.

124.    Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

## COUNT THREE
**(Unlawful Restraint of Trade – Non-*Per Se* Violation of Section 1 of the Sherman Act)**

125.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

126.    Plaintiff asserts this Count in the alternative to Count One, in the event it is found that Plaintiff must establish a relevant antitrust market in connection with its claim under Section 1 of the Sherman Act.

127.    Highmark has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade in violation of 15 U.S.C. § 1, including Highmark's PPA contracts with Independent Pennsylvania Healthcare Practitioners that contain "all products" clauses.

128.    Highmark's agreements, combinations, or conspiracies, individually and collectively, constitute an unreasonable restraint under "quick look" or "rule of reason" analysis. An antitrust market need not be defined exhaustively because of the direct evidence of Highmark's ability to control prices or to exclude competition, *e.g.*, its implementation of the unilateral reimbursement rate cuts discussed herein.  Yet, to the extent necessary, there is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to covered patients, in the geographic market of Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  In addition, there is a product market (or submarket) for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to patients, covered under a QHP in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

129.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial

barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

130.    By virtue of Highmark's coercion, Independent Pennsylvania Healthcare Practitioners in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA) could only obtain reimbursement for rendering medical care to patients covered by a Highmark non-QHP health insurance product if they also acquiesced to obtain reimbursement for rendering medical are to patients covered by a Highmark QHP health insurance product, and vice versa.

131.    Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

132.    Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

133.    As a direct and proximate result of Highmark's continuing violation of Section 1 of the Sherman Act, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a classwide basis, and should be trebled.

134.    Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

## COUNT FOUR
**(Unlawful Restraint of Trade – Non-*Per Se* Violation of Pennsylvania Common Law)**

135.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

136.    Plaintiff asserts this Count in the alternative to Count Two, in the event it is found that Plaintiff must establish a relevant antitrust market.

137.    Highmark has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade in violation of Pennsylvania common law, including Highmark's PPA

contracts with Independent Pennsylvania Healthcare Practitioners that contain "all products" clauses.

138.    Highmark's agreements, combinations, or conspiracies, individually and collectively, constitute an unreasonable restraint under "quick look" or "rule of reason" analysis. In this alternative, an antitrust market need not be defined exhaustively because of the direct evidence of Highmark's ability to control prices or to exclude competition, *e.g.*, its implementation of the unilateral reimbursement rate cuts discussed herein.  Yet, to the extent necessary, there is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to covered patients, in the geographic market of Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  In addition, there are product markets (or submarkets) for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to patients, covered under a QHP Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

139.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

140.    By virtue of Highmark's coercion, Independent Pennsylvania Healthcare Practitioners in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA) could only obtain reimbursement for rendering medical care to patients covered by a Highmark non-QHP health insurance product if they also acquiesced to obtain reimbursement for rendering medical care to patients covered by a Highmark QHP health insurance product, and vice versa.

141.    Highmark's unlawful arrangement affected a not insubstantial amount of commerce in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

142.    Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

143.    Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

144.    As a direct and proximate result of Highmark's continuing violation of Pennsylvania common law, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a classwide basis, and should be trebled.

145.    Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

<u>**COUNT FIVE**</u>
**(Unlawful Monopsonization in Violation of Section 2 of the Sherman Act)**

146.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

147.    Highmark has violated Section 2 of the Sherman Act.

148.    There is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to covered patients, in the geographic market of Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  In addition, there is a product market (or submarket) for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to patients, covered under a QHP in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

149.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

150.    Highmark has gained and exercised unlawful monopsony power over the relevant product market in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA). But for Highmark's exclusionary practices alleged herein, Highmark would not have been able to maintain its monopsony power over the relevant product market in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

151.    Highmark willfully and unlawfully maintained its monopsony power by controlling reimbursement rates and excluding competition from Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  The goal, purpose, or effect of Highmark's scheme was to artificially reduce reimbursement rates to Independent Pennsylvania Healthcare Practitioners and to exclude competition.  Highmark has willfully acquired and/or maintained its monopsony power over Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA) not through superior skill or product, business acumen, or enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

152.    There is no appropriate, procompetitive, or legitimate business justification for the actions and conduct that have facilitated Highmark's monopsonization.

153.    Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

154.    Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

155.    As a direct and proximate result of Highmark's continuing violation of Section 2 of the Sherman Act, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a classwide basis, and should be trebled.

156.    Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

**COUNT SIX**
**(Unlawful Monopsonization in Violation of Pennsylvania Common Law)**

157.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

158.    Highmark has violated Pennsylvania common law concerning unlawful monopolies and exclusionary practices.

159.    There is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to covered patients, in the geographic market of Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  In addition, there is a product market (or submarket) for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to patients, covered under a QHP in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

160.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

161.    Highmark has gained and exercised unlawful monopsony power over the relevant product market in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA). But for Highmark's exclusionary practices alleged herein, Highmark would not have been able to maintain its monopsony power over the relevant product market in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

162.    Highmark willfully and unlawfully maintained its monopsony power by controlling reimbursement rates and excluding competition from Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  The goal, purpose, or effect of Highmark's scheme was to artificially reduce reimbursement rates to Independent Pennsylvania Healthcare Practitioners and to exclude competition.  Highmark has willfully acquired and/or maintained its monopsony power over Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA) not through superior skill or product, business acumen, or enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

163.    There is no appropriate, procompetitive, or legitimate business justification for the actions and conduct that have facilitated Highmark's monopsonization.

164.    Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

165.    Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

166.    As a direct and proximate result of Highmark's continuing violation of Pennsylvania common law, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a class-wide basis, and should be trebled.

167.    Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

**COUNT SEVEN**
**(Unlawful Attempted Monopsonization in Violation of Section 2 of the Sherman Act)**

168.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

169.    Highmark has violated Section 2 of the Sherman Act.

170.    There is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to covered patients, in the geographic market of Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  In addition, there is a product market (or submarket) for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to patients, covered under a QHP in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

171.    Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

172.    Highmark has unlawfully attempted to gain, and has come dangerously close to obtaining, unlawful monopsony power over the relevant product market in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  But for Highmark's exclusionary practices alleged herein, Highmark would not have been able to achieve its monopsony power over the relevant product market in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA), or come dangerously close to doing so.

173.     Highmark willfully and unlawfully attempted to achieve monopsony power by controlling reimbursement rates and excluding competition from Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  The goal, purpose, or effect of Highmark's scheme was to artificially reduce reimbursement rates to Independent Pennsylvania Healthcare Practitioners and to exclude competition.  Highmark has willfully attempted to acquire and/or maintain its monopsony power over Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA) not through superior skill or product, business acumen, or enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

174.     There is no appropriate, procompetitive, or legitimate business justification for the actions and conduct that have facilitated Highmark's attempted monopsonization.

175.     Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

176.     Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

177.     As a direct and proximate result of Highmark's continuing violation of Section 2 of the Sherman Act, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a class-wide basis, and should be trebled.

178.     Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

**COUNT EIGHT**
**(Unlawful Attempted Monopsonization in Violation of Pennsylvania Common Law)**

179.     Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

180.     Highmark has violated Pennsylvania common law prohibiting actual and attempted monopsonization.

181.     There is a product market for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to covered patients, in the geographic market of Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  In addition, there is a product market (or submarket) for the sale of health insurance coverage to patients, as well as a product market for the purchase or reimbursement of medical care rendered to patients, covered under a QHP in Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).

182.     Highmark's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any procompetitive benefits, and was not the least restrictive means of achieving any procompetitive benefits.  Highmark has erected substantial barriers to entry and competition, and its procompetitive justifications are pretextual or are substantially outweighed by the anticompetitive effects of its conduct.

183.     Highmark has unlawfully attempted to gain, and has come dangerously close to obtaining, unlawful monopsony power over the relevant product market in Western Pennsylvania. But for Highmark's exclusionary practices alleged herein, Highmark would not have been able to achieve its monopsony power over the relevant product market in Western Pennsylvania, or come dangerously close to doing so.

184.     Highmark willfully and unlawfully attempted to achieve monopsony power by controlling reimbursement rates and excluding competition from Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA).  The goal, purpose, or effect of Highmark's scheme was to artificially reduce reimbursement rates to Independent Pennsylvania Healthcare Practitioners and to exclude competition.  Highmark has willfully attempted to acquire and/or

maintain its monopsony power over Pennsylvania (or, alternatively, Western Pennsylvania or the Erie County MSA) not through superior skill or product, business acumen, or enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

185.     There is no appropriate, procompetitive, or legitimate business justification for the actions and conduct that have facilitated Highmark's attempted monopsonization.

186.     Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Highmark's unlawful conduct.

187.     Highmark's unlawful arrangement affected a not insubstantial amount of state and interstate commerce.

188.     As a direct and proximate result of Highmark's continuing violation of Pennsylvania common law, Plaintiff and other Class members have suffered injury and damages in an amount to be proven at trial.  Damages may be quantified on a classwide basis, and should be trebled.

189.     Plaintiff, on behalf of itself and other Class members, also seeks injunctive relief to remedy the past, present, and future effects of Highmark's conduct alleged herein.

## COUNT NINE
**(Breach of Contract and Implied Covenant of Good Faith and Fair Dealing)**

190.     Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

191.     Highmark requires all Independent Pennsylvania Healthcare Practitioners to agree to the PPA, the terms and conditions of which have not varied significantly or materially during the Class Period.

192.     Highmark has and continues to require that all Independent Pennsylvania Healthcare Practitioners agree to all terms and conditions of the PPA if any Independent Pennsylvania Healthcare Practitioner has a realistic expectation of reimbursement for rendering

medical services to a patient covered by a Highmark health insurance product.  It is essentially a contract of adhesion.

193.    Highmark has subjected Plaintiff and other Class members to a 4.5% reimbursement rate reduction for services rendered to patients with a Highmark QHP.  This violates the PPA's incorporation of the ACA, including the ACA's anti-discrimination provisions.

194.    By discriminating in reimbursement rates on a basis other than quality of care, Highmark has materially, continuously breached each PPA with Pennsylvanian Healthcare Practitioners.

195.    In addition, every contract imposes on the parties a duty of good faith and fair dealings.  This duty requires that neither party will do anything to injure the right of the other to enjoy the benefits of the agreement.  It imposes on each party the obligation to do everything the contract presupposes they will do to accomplish its purpose, to make effective the agreement's promises in accordance with the spirit of the parties' bargain.  Here, by unilaterally imposing discriminatory reimbursement rate cuts and engaging in other unfair, anticompetitive conduct, Highmark has violated this implied covenant.

196.    Plaintiff and other Class members have materially performed in accordance with the terms of the PPA except and to the extent performance has been excused, or rendered impracticable or impossible.

197.    As a direct and proximate result of Highmark's material breach of contract, Plaintiff and the other Class members have and continue to suffer direct and consequential damages, and other also entitled to declaratory and injunctive relief.

## COUNT TEN
### (Reformation or Rescission)

198.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

199.    In the event a valid agreement is found to exist between Highmark and Plaintiff and other Class members, any such agreement should either be reformed or partially rescinded.

200.    Consent by Plaintiff and other Class members to the terms in the PPA, including the "all products" and reimbursement or related provisions, was not real or free, and/or was given under force, coercion, and/or without consent or mutual material consideration.

201.    The terms governing Highmark's relationship with counterparties to any PPA, including the "all products" clause and reimbursement or related provisions, were not fully disclosed to Plaintiff and members of the Pennsylvania Class.  Thus, Plaintiff and members of the Pennsylvania Class lacked proper notice concerning such terms.

202.    The terms of the PPA contain undisclosed, confusing, and abstruse conditions or terminology.  Highmark unilaterally drafted and impose the "all products" clause and other provisions on Plaintiff and the Pennsylvania Class, which renders any agreement between Highmark and Plaintiff and members of the Pennsylvania Class an unenforceable contract of adhesion.

203.    Moreover, Plaintiff and other Class members were forced or induced to enter into a PPA insofar as Highmark coercively required and/or omitted the full terms or actual arrangement concerning reimbursement and other provisions under the PPA.

204.    By common law or statute, the terms governing each PPA also impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract

are mutually obligated to comply with the substance of their contract in addition to its form.  Here, by unilaterally imposing discriminatory reimbursement rate cuts and engaging in other unfair, anticompetitive conduct, Highmark has violated this implied covenant.

205.    As a direct and proximate result of Highmark's conduct alleged herein, Plaintiff and other Class members believed, and reasonably so, that they had no choice but to agree to the PPA or otherwise be subject to its terms.

206.    With any possible consent given only under force, oppression or other inappropriate conditions, as set forth above, Plaintiff, on behalf of itself and other Class members seeks reformation of the PPA, or rescission of any offending terms, so that the terms are reasonable, fair, not anticompetitive, specific, and/or determinable.

## COUNT ELEVEN
### (Unjust Enrichment)

207.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

208.    Highmark has knowingly received and retained wrongful benefits from Plaintiff and other Class members in the form the difference in the amount of the reimbursement rates Highmark has paid to Independent Pennsylvania Healthcare Practitioners for serviced rendered to patients covered by a Highmark QHP, and the higher, non-discriminatory rates it should have paid, and any other wrongly withheld amounts.  In so doing, Highmark acted intentionally or with conscious disregard for the rights of Plaintiff and other Class members.

209.    As a result of Highmark's wrongful conduct as alleged herein, Highmark has been unjustly enriched at the expense, and to the detriment, of Plaintiff and other Class members.

210.    Highmark's unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

211.     It is unfair and inequitable for Highmark to be permitted to retain the benefits it has withheld, and is still withholding, without justification, from the wrongful conduct alleged herein. Highmark's retention of such benefits under the circumstances is inequitable.

212.     The financial benefits derived by Highmark rightfully belong to Plaintiff and other Class members, in whole or in part.  Highmark should be compelled to account for and disgorge in a common fund for the benefit of Plaintiff and other Class members all wrongful or inequitable proceeds withheld from them.  A constructive trust should be imposed upon all wrongful or inequitable sums withheld by Highmark traceable to Plaintiff and the members of the Class.

213.     Plaintiff and other Class members have no adequate remedy at law.

214.     Highmark's unilateral decision not to reimburse Independent Pennsylvania Healthcare Practitioners for services rendered to patients covered by a Highmark QHP at non-discriminatory rates amounts to an illusory promise rendering any agreement unenforceable, unconscionable, void, or voidable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

- An order certifying that the action may be maintained as a Class Action;
- A decree that the acts alleged herein be adjudged and decreed to be anticompetitive or otherwise unlawful in violation of federal and state law;
- A declaration that Highmark's acts alleged herein violate the PPAs or similar contracts between Highmark and Class members;
- A judgment to be entered against Highmark, jointly and severally as appropriate, for damages as a result of Highmark's violations of federal and state law;
- A judgment to be entered against Highmark and in favor of Plaintiff and the proposed Class on Plaintiff's claims, for actual, double, or treble damages, actual and consequential damages, and equitable relief, including restitution or disgorgement;
- Declaratory and injunctive relief requiring Highmark to rescind the reimbursement rate cuts complained of herein, and to make Plaintiff and the Class whole as a result

of such rate cuts, or reformation of the PPAs or similar contracts to prohibit the reimbursement rate cuts complained of herein, as well as other appropriate declaratory and injunctive relief;

- Pre-judgment and post-judgment interest from the date of filing this suit;

- Reasonable attorneys' fees;

- Costs of this suit; and

- Such other and further relief as the Court may deem necessary or appropriate.

**Dated:  May 11, 2017**                                                      Respectfully submitted,

*/s/ Kenneth J. Grunfeld*

Richard M. Golomb, Esquire
(*admission pending*)
Ruben Honik, Esquire
(*admission pending*)
Kenneth J. Grunfeld, Esquire
David J. Stanoch, Esquire
 (*admission pending*)
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email: rgolomb@golombhonik.com
          rhonik@golombhonik.com
          kgrunfeld@golombhonik.com
          dstanoch@golombhonik.com

*Attorneys for Plaintiff and the Proposed Class*