# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PRESQUE ISLE COLON AND RECTAL )
SURGERY, on Behalf of Itself and All )
Others Similarly Situated, )
                         )
                *Plaintiff,* )
                         )
       v.                   )
                         )
                         )
HIGHMARK HEALTH, HIGHMARK INC. )
f/k/a HIGHMARK HEALTH SERVICES, )
and HIGHMARK CHOICE COMPANY )
f/k/a KEYSTONE HEALTH PLAN WEST, )
INC., )
                *Defendants.* )
_____ )

Civil Action No. 17-122

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS

## I.     INTRODUCTION

The matter before the Court is Defendants Highmark Health, Highmark Inc., and

Highmark Choice Company's (collectively "Highmark") second motion to dismiss. Plaintiff

Presque Isle Colon and Rectal Surgery ("Plaintiff") instituted this action against Highmark

alleging in its original complaint that Highmark violated Sections 1 and 2 of the Sherman

Antitrust Act as well as Pennsylvania's antitrust laws, breached the parties' contract and implied

covenant of good faith and fair dealing, and was unjustly enriched. Dkt. No. 1. Highmark then

moved to dismiss Plaintiff's claims, arguing that Plaintiff failed to sufficiently allege a violation

of the federal antitrust laws. Dkt. No. 17. This Court agreed with Highmark and dismissed

largely for failure to sufficiently set forth a federal antitrust violation but granted plaintiff leave

to amend its federal law claims and replead its pendent state and common law claims. Dkt. No.

35.

Plaintiff filed an amended complaint on December 3, 2018. Dkt. No. 42. In it, Plaintiff reasserts its claims as to Highmark's violations of the Sherman Antitrust Act, Pennsylvania's antitrust laws, and Pennsylvania common law causes of action including unjust enrichment, breach of contract and covenant of good faith and fair dealing, and reformation or rescission. Dkt. No. 42. Currently before the Court is Highmark's motion to dismiss the amended complaint in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the amended complaint still fails to state a claim on which relief can be granted. Dkt. No. 47.

Having reviewed the motion to dismiss the amended complaint, the opposition thereto, the record of the case, and the relevant legal authorities, the Court will GRANT in part and DENY in part the motion. Specifically, the Court will grant the motion as to Plaintiff's Section 1 and related Pennsylvania common law claims, as well as its claims of unjust enrichment and breach of contract. The Court will deny, however, the motion as to Plaintiff's Section 2 and related Pennsylvania common law claims, as well as its claims for breach of implied covenant of good faith and fair dealing and reformation and rescission. The Court's reasoning follows:

## II. BACKGROUND

The Court assumes familiarity with the facts of this case, as described in the Court's September 6, 2018 Memorandum Order granting the Highmark's first motion to dismiss for failure to state a claim. Dkt. No. 17. For clarity's sake, however, the Court will reiterate some of the salient facts, as pled in the amended complaint. Dkt. No. 42.

### A. The Parties

Plaintiff operates an independent physician-run medical practice organized under the laws of Pennsylvania and located in Erie County, Pennsylvania, part of the Erie County

2

Metropolitan Statistical Area ("MSA"). Dkt. No. 42 at ¶ 14.[1]

Highmark is comprised of three Pennsylvania corporations that provide health insurance coverage to its members under various healthcare plans, including PPOs, HMOs, and ACA[2]-compliant private health insurance plans. *Id.* at ¶¶ 15–17; Dkt. No. 47 at 3. In the healthcare industry, medical service providers, such as Plaintiff, are considered sellers because while they provide care to patients they sell their services to insurers, like Highmark, in exchange for contractually determined "reimbursements."[3] Dkt. No. 35 at 2–3 (internal citations removed). Insurers, such as Highmark, are then considered buyers of physician services. *Id.* (internal citations removed).

Highmark is one of the largest health insurers in the Commonwealth of Pennsylvania, with "more than 4 million covered lives." Dkt. No. 42 at ¶¶ 2, 42; Dkt. No 47 at 3 n.3. Plaintiff alleges that Highmark is the "dominant" health insurer in the region, insuring at least 65% of health insurance enrollees in Western Pennsylvania[4] and far in excess of 65% of enrollees in the Erie County MSA. Dkt. No. 42 at ¶¶ 2, 43. Additionally, Plaintiff contends that Highmark "controls commensurate shares of reimbursements" to independent physicians in both the Erie County MSA and Western Pennsylvania based on the assertion that it is "responsible for 'buying'" at least 65% of the outpatient physician services to insured patients in Western

---

[1] The instant case is a putative class action in which Plaintiff purports to represent a proposed class comprised of all "independent physicians and/or independent physician practices" alternatively in the Erie County MSA or the 29-county Western Pennsylvania area who treat patients covered by a "Highmark health insurance product." Dkt. No. 42 at ¶¶ 1, 67.
[2] Patient Protection and Affordable Care Act, Pub.L. No. 111–148, 124 Stat. 119 (2010) (the "ACA") (codified at 42 U.S.C. § 18001 *et seq.*).
[3] Reimbursements are the payments insurers give to providers to cover services rendered to the insurers' subscribers. *West Penn*, 627 F.3d at 92.
[4] According to Plaintiff, Highmark defines Western Pennsylvania to include Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, part of Centre, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland counties. Dkt. No. 42 at ¶ 2 n.1.

Pennsylvania and "well in excess" of 65-70% of the same services in the Erie County MSA. *Id.* at ¶¶ 3, 43. Thus, Plaintiff asserts, "Highmark is both the largest health insurer *and* the largest buyer of outpatient physician services in these areas." *Id.* at ¶ 3 (emphasis in original).

In addition to its health insurance business, Highmark recently entered the outpatient physician services market by acquiring several hospitals and other healthcare facilities. *Id.* at ¶¶ 4, 46. Highmark now controls St. Vincent Hospital, which Plaintiff explains is the "largest hospital system in Erie." *Id.* at ¶ 4. Plaintiff also reports that Highmark has announced plans to build or operate at least four other facilities in Pennsylvania. *Id.* at ¶ 4 n.2.

In 2011, Plaintiff and Highmark signed a Professional (or Participating or Preferred) Provider Agreement ("PPA"), in which Plaintiff agreed to render medical care to Highmark-covered patients and Highmark, in turn, agreed to pay, or "reimburse," Plaintiff for its services. Dkt. No. 42-1; *see also* Dkt. No. 42 at ¶¶ 14, 59–61.[5] The PPA governs the reimbursement terms between the parties and includes two relevant clauses to the instant case. First, the PPA provides for a variable reimbursement rate, in which "allowances [paid to specialist] may be reviewed and adjusted from time to time during the Term." Dkt. No. 42-1 at Att. 6.1 § 4.2; *see also* Dkt. No. 42 at ¶ 60. Second, the PPA contains an "all products" clause, through which Plaintiff agreed to treat patients enrolled in any insurance product offered by Highmark (the "All Products Clause"). Dkt. No. 42-1 at § 4.1; *see also* Dkt. No. 42 at ¶¶ 13, 61.[6]

---

[5] The PPA is a standard form contract drafted by Highmark. Plaintiff contends that Highmark does not negotiate any of its terms, including reimbursement rates. Dkt. No. 42 at ¶¶ 59–60.

[6] In its entirety, the All Products Clause reads: **Network Product Participation**. Provider must and, where applicable, must ensure that all Practitioners participate in all Network Products covered under this Agreement, as described by [Keystone Health Plan West] and so long as Provider and Practitioners, as applicable, meet all required Participation Criteria applicable to a Network Product. Provider's and each Practitioner's participation in a Network Product will be subject to all terms and conditions contained in this Agreement and, as applicable, related attachments hereto. Provider and [Keystone Health Plan West] agree that such participation is not exclusive and that other Providers and Practitioners may also participate as designated by [Keystone Health Plan West].

**B. The Current Dispute and The Court's Previous Order granting Motion to Dismiss**

Relations between the parties deteriorated when Highmark implemented a 4.5% "across-the-board" reimbursement rate cut effective April 1, 2016, for outpatient services rendered to patients covered by one of Highmark's ACA-compliant healthcare plans. Dkt. No. 42 at ¶¶ 10, 65, 164. Plaintiff instituted the instant action on May 11, 2017, alleging antitrust violations of both Section 1, 15 U.S.C. § 1, and Section 2, *id.* at § 2, of the Sherman Antitrust Act, as well as related Pennsylvania common law causes of action. Dkt. No. 1. Plaintiff's original complaint focused on the PPA, alleging that it constitutes an unreasonable restraint of trade under Section 1, Dkt. No. 1 at ¶¶ 111–12, 126–27, and that Highmark maintains and abuses monopsony[7] power by combining the reimbursement rate cuts with the All Products Clause to "forc[e] upon independent physician" an "anticompetitive scheme." Dkt. No. 35 at 6 (internal quotations and citations removed). As stated above, Highmark moved to dismiss the original complaint for failure to state a claim, which this Court granted in a written decision dated September 6, 2018 ("hereinafter, "the September Order"). Dkt. Nos. 17 and 35.

The September Order focused on Plaintiff's Section 1 and 2 claims. In regard to the Section 1 claim, the Court held that Plaintiff failed to allege an "agreement" which is required to satisfy Section 1's prohibition against "*agreement*[s] that unreasonable restrain trade." Dkt. No. 35 at 9 (emphasis in original). With respect to the Section 2 claims, the Court held that Plaintiff failed to satisfy both the requirements of antitrust injury and the substantive requirements of Section 2, which prohibits "unlawful monopsony" and attempted monopsony. *Id.* at 9–16. This

---

[7] A monopsony is a monopoly, but on the "buy side" of the market, in which one consumer is able to dictate conditions in the given market based on its dominant position. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly'"). As mentioned previously, health insurers, such as Highmark, are considered "buyers" of doctors' services. Dkt. 35 at 7 (citing *Kartell*, 749 F.2d at 924.

Court's reasoning rested on the conclusion that a unilateral depression of reimbursement rates "does not, on its own, run afoul of § 2." *Id.* at 10. As this Court stated, "absent 'special circumstances, where, for example, a price is below incremental cost,' there is no harm *to the market, i.e.*, there is no 'antitrust injury." *Id.* at 11 (emphasis in original) (quoting *Kartell v. Blue Shield of Massachusetts*, 749 F.2d 922, 927 (1st Cir. 1984), *cert. denied*, 471 U.S. 1029 (1985)); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) ("*West Penn*")). Therefore, this Court dismissed the complaint with leave to amend.

As both parties have noted in their briefing, *see, e.g.*, Dkt. No. 48 at 1–2, the Court invited Plaintiff in its repleading to address how (1) Highmark's acquisition of Saint Vincent enhanced its unlawful monopsony as a health insurer and (2) Highmark treats independent physicians differently from Highmark-acquired hospitals, Dkt. No. 12–13. In addition, this Court instructed Plaintiff to provide a "breakdown of [its] insured, non-insured, and ACA-insured patients," as well as additional business-related information, necessary to support a predatory pricing claim. *Id.* at 13–14.

## C. Amended Complaint and Motion to Dismiss

Plaintiff has now provided an amended complaint. Dkt. No. 42. Plaintiff still advances causes of action under Section 1 of the Sherman Antitrust Act (Counts 5 and 7) and related Pennsylvania common law antitrust claims (Counts 6 and 8); Section 2 of the Sherman Antitrust Act (Counts 1 and 3) and related Pennsylvania common law antitrust claims (Counts 2 and 4); and Pennsylvania common law causes of action for Unjust Enrichment (Count 9), Breach of Contract and Implied Covenant of Good Faith and Fair Dealing (Count 10), and Reformation or Recission (Count 11).

The most immediate difference between the original complaint and the amended complaint is that Plaintiff has refashioned its Section 1 claim as an "unlawful tying" claim, in which it claims Highmark restrained trade by "unlawfully tying" reimbursements "under any of its health insurance products to the reimbursement of the same under any of its other health insurance product" through the All Products Clause. *Id.* at ¶ 119.[8] Additionally, Plaintiff revised large sections of its Section 2-related allegations in an attempt to address some of this Court's concerns highlighted in the September Order.

Plaintiff now contends that Highmark's reduction in reimbursements rates "has led, and will continue to lead," to a reduction in the quantity and quality of outpatient physician services, including colorectal services in both the Erie County MSA and Western Pennsylvania. Dkt. No. 42 at ¶ 5. Specifically, Plaintiff claims that "predatorily reduced reimbursement rates to below independent physicians' costs" will result in such physicians going out of business, reducing the quantity of such services available to patients, and that Highmark has not imposed the same rate reductions on physicians working at Highmark-controlled facilities. *Id.* at ¶ 6. Further, according to Plaintiff, rate reductions will also result in a degradation of quality of services available to patients as independent physicians will "cease performing better, higher-quality procedures with favorable patient outcomes." *Id.* at ¶ 7. Plaintiff also alleges that at the same time Highmark cut reimbursement rates, it simultaneously raised premium rates for enrollees, for example increasing rates for Highmark ACA plans between 20.1%–21.5% in 2016 and 48.1%, "or more," in 2017. *Id.* at 9–10, 44.

---

[8] The Court originally dismissed Plaintiff's Section 1 claim with prejudice. Dkt. No. 35 at 16. Plaintiff then filed a motion for reconsideration its Section 1 claim under a tying theory. Dkt. 38. After full briefing and consideration, the Court granted Plaintiff's motion. Dkt. No. 41.

In addition to "predatorily depressed reimbursement rates," Plaintiff now adds "other anticompetitive conduct," which it contends is "designed to raise [Plaintiff's] costs, harm their [*sic*] business[], or impede their [*sic*] ability to compete against Highmark-controlled outpatient physician services." Dkt. No. 42 at ¶ 12. This alleged conduct includes (1) an "extraordinary number of so-called 'audits,'" which Plaintiff contends are pretextual attempts to "claw-back" fairly earned reimbursements and interfere with quality of care, (2) steering patients away from Plaintiff in favor of Highmark's own outpatient services, and (3) instituting procedure codes that "result in gross inefficiencies," including forcing Plaintiff to perform multiple procedures where it could perform just one, resulting in "inconvenience and burden on [Plaintiff's] patients." Dkt. No. 42 at ¶¶ 12, 49–58. Plaintiff contends that independent physicians are unable to avoid this anticompetitive conduct based on the All Products Clause, which forces physicians "to accept reimbursement from *all* of Highmark's health insurance products or none at all." *Id.* at ¶ 13. Independent physicians, according to Plaintiff, cannot forgo treating Highmark patients because of the insurers' dominance in the relevant markets. *Id.* at ¶¶ 13, 59–66. As a result, Plaintiff claims it has "lost approximately $200,000 to $300,000 annually." *Id.* at ¶¶ 11, 47.

As stated above, Highmark moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that it still fails to state a claim upon which relief can be granted.

## III.    LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of claims asserted in a complaint. To survive such a motion, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "facially plausible"

when the plaintiff pleads sufficient facts for a court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In determining whether a complaint "states a plausible claim for relief," the reviewing court must "draw on its judicial experience and common sense." *Id.* at 679.

When considering a motion to dismiss, a court must "'accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff.'" *Estate of Roman v. City of Newark*, 914 F.3d 789, 795 (3d Cir. 2019) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). At the same time, the court is "not compelled to accept 'unsupported conclusions and unwarranted inferences.'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)). Nor is it compelled to accept "'a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## IV. ANALYSIS

The central thrust of Highmark's renewed motion to dismiss is that Plaintiff's amended complaint is long on conclusory statements and short on factual allegations. *See, e.g.*, Dkt. No. 47 at 2 ("Plaintiff's Amended Complaint fails to state an antitrust claim because, among its generalized grievances, there are no allegations of reduced competition that increase prices or harm consumers."). Highmark is largely correct. Plaintiff's amended complaint contains many assertions regarding the degradation of quality and quantity of outpatient physician services in the relevant markets and the harm that "has and will result," Dkt. No. 42 at ¶ 6, but provides little by way of specific factual allegations regarding the alleged harm to the market in general (*e.g.* other independent physician practices) or patients. However, construing the amended complaint most favorably to Plaintiff as this Court is required to do at this nascent stage of the litigation, as

is discussed in detail below, the Court concludes that most of Plaintiff's claims survive Highmark's motion to dismiss.

Highmark's central argument is that the amended complaint fails to adequately plead an antitrust injury.[9] Thus, the Court will begin there.[10]

## A. Antitrust Injury

Section 4 of the Clayton Act enables a private plaintiff "who shall be injured in his [or her] business or property by reason of anything forbidden in the antitrust laws" to sue for treble damages. 15 U.S.C. § 15. "While the statutory language of [Section 4] is broad," the Supreme Court and the Third Circuit have recognized that "plaintiffs must also have 'antitrust standing.'" *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 341 (3d Cir. 2018) (quoting *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171 (3d Cir. 2015). Antitrust standing differs from Article III constitutional standing in that it is "prudential." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir.), *cert. denied*, 139 S. Ct. 211 (2018) ("*Phila. Taxi*"); *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013). "It does not affect the subject matter jurisdiction of the court, as Article III standing does, but prevents a plaintiff from recovering under the antitrust laws." *Ethypharm S.A. France*, 707 F.3d at 232.

---

[9] "Antitrust injury" is but one element of "antitrust standing," which involves an analysis of "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993). Highmark has challenged only the sufficiency of Plaintiff's showing antitrust injury, and no other element of antitrust standing. *See* Dkt. No. 48 at 7 n.1; *see generally* Dkt. No. 47 at 6–12.

[10] The Third Circuit has left unresolved which to address first, "an antitrust violation or an antitrust injury." *Phila. Taxi*, 886 F.3d at 338. As such, the Court sees no issue in starting with the prudential antitrust standing issue before proceeding to the substantive claims of Section 1 and 2.

Antitrust injury, in turn, is a "necessary but insufficient condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1166 (3d Cir. 1993)); *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons."). Establishment of an antitrust injury is meant to advance the goals of antitrust law— "protect[ing] *competition*, not *competitors*," *Phila. Taxi*, 886 F.3d at 338 (emphasis is original)— by ensuring "that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990); *West Penn*, 627 F.3d at 101.

To establish antitrust injury, a "plaintiff must do more than show that it would have been better off absent the violation." *West Penn*, 627 F.3d at 101 (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477 (1977)). Rather, a plaintiff must prove that it suffered an "injury of the type the antitrust laws were intended to prevent" and that the injury "flows from that which makes defendants' acts unlawful." *Brunswick Corp.,* 429 U.S. at 489; *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("the injury prong requires: (1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful") (internal quotations and citation removed). Plaintiff bears the burden of this showing. *See Phila. Taxi*, 886 F.3d at 343 ("the plaintiff must prove . . .").

At this early stage, the pleading standard is permissive; indeed, as the Third Circuit has recognized, "[t]he existence of antitrust injury is not typically resolved through motions to

dismiss." *Schuylkill Energy Res.*, 113 F.3d at 417) (citing *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995). An antitrust plaintiff is only required to "allege facts capable of supporting a finding or inference that the purported anticompetitive conduct produced" the purported harm. *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 577 (E.D. Pa. 2018) (quoting *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-2785, 2017 WL 6524839, at *15 (D. Kan. Dec. 21, 2017)).

Highmark claims that Plaintiff has failed to meet even this low standard in its amended complaint. It moves the Court to dismiss based largely on the contention that the Plaintiff has advanced only "purely conclusory" allegations of reduced output and quality and that these allegations are "unsupported by any factual allegations" showing harm to competition or consumers. Dkt. No. 47 at 7. Further, it alleges that Plaintiff has failed to adequately plead injury stemming from anticompetitive conduct based on a summary claim of a "$200-300,000 annual loss." *See* Dkt. No. 47 at 10–11.

Plaintiff replies that it has sufficiently alleged antitrust injury based on pleading that Highmark's anticompetitive conduct, including predatorily low reimbursement rates for outpatient services, unnecessary audits, unfair steering of patients away from independent physicians, and inefficient procedure codes and requirements, leaves patients with "no choice but to turn to inferior, more costly services" and independent physicians with "no choice but to endure Highmark's" anticompetitive actions or go out of business.[11] Dkt. No. 48 at 2, 4–6. For the reasons stated below, the Court finds that Plaintiff has alleged a sufficient antitrust injury to establish its antitrust standing.

---

[11] Specifically, Plaintiff contends that Highland has attempted "multiple times" to buy out Plaintiff's practice and get Plaintiff to "join Highmark's own system at St. Vincent Hospital." Dkt. No. 42 at ¶ 48. According to Plaintiff, this behavior constitutes a pattern in which "Highmark aims to absorb its rivals in the outpatient patient services market, or put them out of business." Dkt. No. 48 at 4.

*1. Plaintiff Pleads Injury of the Type the Antitrust Laws Were Intended to Prevent*

To establish an antitrust injury, a plaintiff must allege an injury that is "the type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489. This inquiry involves identifying the alleged anticompetitive conduct and determining whether that conduct injured "consumers or [] competition in general." *See Phila. Taxi*, 886 F.3d at 344; *see also id.* at 339 ("[a]llegations of purportedly anticompetitive conduct are meritless if those acts would cause no deleterious effect on competition"). To determine whether conduct is anticompetitive, the court must look at the conduct "as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see also Phila. Taxi*, 886 F.3d at 339. From there, the alleged injury must be "attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co.*, 495 U.S. at 334; *West Penn*, 627 F.3d at 101. As such, the court must "examine the causal connection between the purportedly unlawful conduct and the injury" claimed to the market and consumers. *Lifewatch Servs. Inc.*, 902 F.3d at 342 (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998)).

Highmark contends that Plaintiff has failed to allege "a single example of an actual reduction in the delivery of outpatient physician services or any reduction in competition," Dkt. No. 47 at 7, or harm to consumers, *id.* at 9–10. For example, Highland contests that patients will be forced to "turn to inferior, more costly services from Highmark-controlled facilities," Dkt. No. 48 at 2, by claiming that there are "no factual allegations . . . to suggest that patient choice has been reduced or that St. Vincent Hospital's services are inferior to Plaintiff's [services]," Dkt. No. 49 at 5. In sum, the thrust of Highmark's arguments is that Plaintiff has still failed to allege anticompetitive conduct and that such conduct led to harm to competition or consumers.

Plaintiff replies that the amended complaint adequately alleges antitrust injury based on the addition of further alleged anticompetitive conduct, which supplemented Plaintiff's original complaint of predatorily low reimbursement rates, including unnecessary audits, unfair steering, and inefficient procedure codes and requirements. Dkt. No. 48 at 2, 4–6.

As it is the complaint that must "state[] a plausible claim for relief," the Court examines the amended complaint critically to see if it has met the minimal standard necessary to survive a motion to dismiss. *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). The central contention of the amended complaint remains Plaintiff's allegations of predatorily low reimbursement rates and independent physicians' inability to escape or bargain around such cuts based on Highmark's claimed monopsony. As the Court previously held in the September Order, Plaintiff's allegations regarding rate reductions, even when coupled with the All Products Clause, do not suffice to establish antitrust injury or a substantive claim under Section 2. *See* Dkt. 35 at 10–14 (holding that there is no "harm *to the market*" when insurers, even with monopsony power, "contractually extract, and then pay, noncompetitive prices to medical providers") (citing *Kartell*, 749 f.2d at 927)) (emphasis in original).

In its amended complaint, however, Plaintiff has added substantive claims of additional anticompetitive conduct that it alleges has and will continue to cause adverse effects on competition and consumers. First, Plaintiff claims it and other independent physicians have been subjected to unnecessary audits as a means to "claw-back" previously disbursed reimbursements that "interfere with treatment decisions." Dkt. No. 42 at ¶¶ 12, 49–50. Plaintiff claims that Highmark "does not subject physicians working at Highmark-controlled facilities to the same scrutiny." *Id.* at ¶ 12. These audits hurt independent physicians by "rais[ing] [physicians']

costs" and "diverting resources away from providing outpatient colorectal services to patients." *Id.* at ¶ 50.

Second, Plaintiff alleges that Highmark subjects independent physicians to inefficient procedure codes and requirements. Dkt. No. 42 at ¶ 51. These procedure codes have forced Plaintiff to schedule patients for two different "procedures," where one would suffice, subjecting patients to "inconvenience and burden" not to mention any pain and discomfort resultant from the procedures themselves. *Id.*

Finally, Plaintiff alleges that Highmark uses its dominance and market presences to "steer" patients away from independent physicians to its own facility. *See* Dkt. No. 42 at ¶ 12, 46 ("Highmark seeks to . . . steer patients away from independent physicians and to Highmark-controlled providers"), ¶¶ 53–57 (recounting the experiences of patients A through D, who report to Plaintiff attempts by hospital staff at Highland facilities to steer them away from care at independent physicians). "This includes," according to Plaintiff, allegations that Highmark has "misrepresent[ed]" to patients that Plaintiff's physicians do not have admitting privileges at St. Vincent, when they do, and that patients must use St. Vincent physicians only. *Id.* at ¶ 53.

When these allegations are taken in concert with Plaintiff's allegations of predatory reimbursement reductions, market dominance, and alleged coercion through the use of the All Product Clause, a facially plausible pleading emerges. *See Iqbal*, 556 U.S. at 678. First, there is plausible harm to competition. Plaintiff has alleged that Highmark uses its dominance on the "buy side" of the market, including insisting on unnecessary audits, inefficient procedure codes, and predatorily low reimbursement rates, to drive up the costs for and lower the income of independent physicians. All the while, according to Plaintiff, Highmark does not subject its own facilities to such treatment. And, according to Plaintiff, independent physicians "cannot avoid

the anticompetitive or predatory effects" of Highmark's actions based on its market dominance, and its non-negotiable insistence on the All Products Clause. Dkt. No. 42 at ¶ 12. "This has and will result," according to Plaintiff, "in independent physicians providing fewer outpatient physician services, or going out of business entirely." *Id.* at ¶ 6. Additionally, "independent physicians have lost substantial money as a result of Highmark's predatory reimbursement rates and related practices." *Id.* at ¶ 11. In fact, this is the entire point according to Plaintiff, as Highland's dominance on the insurance end of the market allows it to unfairly compete on the physician services end of the market, driving independent physicians into the Hobson's choice between absorption or going out of business. Thus, these allegations are enough to establish anticompetitive conduct in differentiated treatment meant to harm competition on the provider side of the market by utilizing monopsony power on the insurance side of the market.

Meanwhile, Plaintiff has also plausibly alleged harm to patients. Through weakening competition between independent physicians and Highmark facilities by exploiting its position as buyers of medical services, Plaintiff alleges that patients have been subjected to a "reduction in the quantity [and] a degradation in the quality of outpatient physician services." Dkt. No. 42 at ¶ 5. This includes patients being subjected to unnecessary procedures, increases in premiums, and the confusion and frustration that potentially arises when being steered away from one's preferred physician based on what insurance allegedly will and will not cover.

These allegations, taken as true and as a whole as the Court must, are sufficient to adequately plead at the 12(b)(6) stage that Highmark has engaged in anticompetitive conduct and that the alleged conduct has caused harm to competition and consumers.

## 2. *Plaintiff Pleads Injury Which Flowed from Anticompetitive Conduct*

As stated above, it is not sufficient for Plaintiff to simply allege that there has been anticompetitive conduct that caused harm to the market and consumers. Rather, Plaintiff must also show that it was injured by the anticompetitive conduct and that the injury "flows from that which makes defendants' acts unlawful." *Id.*

Highmark contends that Plaintiff has failed to sufficiently plead this prong of antitrust injury in the amended complaint. It disputes the amended complaint's contention that Plaintiff "has lost approximately $200,000 to $300,000 annually," Dkt. No. 42 at ¶¶ 11, 47, on two levels. First, Highmark asserts that the loss "is not an antitrust injury because it does not arise" from conduct the type of which the antitrust laws were intended to prevent. Dkt. 47 at 10–11. Second, it attacks the figure directly by asserting that the alleged losses are insufficient because they "say[] nothing about whether and to what extent those losses relate to reimbursements from Highmark or other payors, how Highmark's reimbursements relate to Plaintiff's costs," *etc.* Dkt. 49 at 3–4. Plaintiff simply responds that it has alleged proper injury based on the claimed losses of "$200,000 to $300,000 annually due to Highmark's predatory rates." Dkt. No. 48 at 5.

While Plaintiff's pleading regarding injury stemming from anticompetitive conduct is barebones, it is sufficient to survive this stage of the pleadings. Plaintiff has alleged an injury, "$200,000 to $300,000 annually," resulting from a "rates drop below its costs for numerous procedures" attributable to "predatorily depressed reimbursement rates." Dkt. No. 42 at ¶ 47. Plaintiff has also alleged that Highmark's anticompetitive conduct, in the form of unnecessary audits and inefficient procedure codes "raise its costs" and "divert[] resources away from providing" patient care. *Id.* at ¶ 50. This is a sufficient allegation of losses stemming from anticompetitive conduct.

As such, Plaintiff has established a showing of antitrust injury, which comports with the goals of antitrust law. *See Iqbal*, 556 U.S. at 678. In essence, the inquiry into antitrust standing and antitrust injury is a question of whether the right plaintiff is before a court to assert a private cause of action under the antitrust laws. *See Associated Gen. Contractors of Cal., Inc. v. Cal. Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (antitrust standing differs from the constitutional standing requirement of injury in fact in that a court "must make a further determination whether the plaintiff is a proper party to bring a private antitrust action"); *Phila. Taxi*, 886 F.3d at 343. Plaintiff claims that it, and the putative class it represents, are both direct competitors to and at the mercy of Highmark based on Highmark's unique position as both dominant buyer and competitive seller in the relevant market. Having reviewed the pleadings and relevant case law, the Court determines that at this stage in litigation Plaintiff has demonstrated that it is the correct plaintiff to advance an antitrust claim.

Having so determined, the Court will proceed to examine Plaintiff's substantive claims under Sections 1 and 2 of the Sherman Antitrust Act.

## B. Section 2 of the Sherman Antitrust Act

In counts one and three of the amended complaint, Plaintiff charges Highmark with unlawful monopsonization and unlawful attempted monopsonization in violation of Section 2 of the Sherman Antitrust Act. Dkt. No. 42 at ¶¶ 81–90, 100–08. Similarly, Plaintiff charges Highmark with unlawful monopsonization and unlawful attempted monopsonization in violation of Pennsylvania common law in counts two and four. *Id.* at ¶¶ 90–99, 109–17. As these causes of action contain significant overlap, the Court will address them together. *See InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 n.8 (3d Cir. 2003) ("[b]ecause Pennsylvania has no separate antitrust statute, [Plaintiff]'s [Pennsylvania antitrust] 'allegation rises or falls with plaintiff's

federal antitrust claims'") (quoting *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir.1994)).

### 1. Count 1: Unlawful Monopsonization in Violation of Section 2

Section 2 of the Sherman Antitrust Act provides that it is illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C § 2.[12] In order to establish a claim under Section 2, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *LePage's Inc.*, 324 F.3d at 149 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

In its motion to dismiss, Highmark claims that Plaintiff fails to adequately plead the necessary elements for a claim under Section 2 based largely on the same complaint of "conclusory" anticompetitive conduct "unconnected to any antitrust injury." Dkt. No. 47 at 13. Plaintiff's pleading, according to Highmark, fails to allege the second required element of willful acquisition or maintenance of power because, "[a]side from reduced rates" which the Court previously determined could not sustain a Section 2 claim alone under *Kartell*, Plaintiff has alleged conduct "that is not in fact anticompetitive." *Id.* at 14.

Plaintiff responds that it has adequately pled a Section 2 claim based on Highmark's dominant position in the market and ability to effect prices, including reducing prices paid to

---

[12] The Court applies the same standard as a claim of monopoly to this situation of an allege monopsony based on the close "kinship between monopoly and monopsony," which suggests that "similar legal standards should apply to claims of monopolization and to claims of monopsonization." *Weyerhaeuser Co.*, 549 U.S. at 322.

independent providers, while simultaneously raising premiums paid by consumers. Dkt. 48 at 12.

As it relates to the first element, market share, Plaintiff claims that Highmark insures "in excess of" 65-75% of all health insurance enrollees in Western Pennsylvania and "far in excess of" 65-70% of all health insurance enrollees in the Erie County MSA. Dkt. No. 42 at ¶ 2. Similarly, it pleads that Highmark is responsible for buying "at least" 65% of outpatient services in Western Pennsylvania and "well in excess" of 65-75% of the same services in the Erie County MSA. *Id.* at ¶ 3. Such high market shares are sufficient, at this stage, to plead monopsony power in the relevant markets. *See, e.g., In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007) (Plaintiffs at Rule 12(b)(6) stage had "pled sufficiently monopoly power for defendant . . . by alleging that defendant . . . controlled sixty to ninety percent of the [relevant] market.").

As it relates to the second element, that of the "the willful acquisition or maintenance of that power," "[a] monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *LePage's Inc.*, 324 F.3d at 146–147 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32 (1985)). The Court has already established that Plaintiff has sufficiently pled that Highmark engaged in anticompetitive conduct and that such conduct caused injury to competition and consumers to survive a 12(b)(6) motion. *See supra* at 12–16. As such, the Court finds that Plaintiff has sufficiently pled a claim under Section 2 to survive a 12(b)(6) challenge. *See Iqbal*, 556 U.S. at 678.

   2. *Count 3: Unlawful Attempted Monopsonization in Violation of Section 2*

In order to establish a claim of attempted monopolization, a plaintiff must sufficiently plead "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Race Tires Am.*, 614 F.3d at 75 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

Highmark attacks Plaintiff's pleading of attempted monopsonization on the independent ground that Plaintiff has failed to adequately allege intent. Dkt. No. 47 at 15 n.5. As the Court stated in the September Order, "Plaintiff understandably has trouble" setting forth sufficient allegations as it has "assumed that Highmark already has monopsony power." Dkt. No. 35 at 15. Plaintiff responds that the amended complaint alleges that "Highmark acted with anticompetitive purpose to gain unlawful market power" sufficient to meet the intent requirement of attempted monopsonization. Dkt. No. 48 at 16.

The amended complaint charges Highmark with engaging in conduct that "had and continues to have an anticompetitive purpose and effect on competition" that was not "offset by any procompetitive benefits." Dkt. 42 at ¶¶ 102, 111. "[E]vidence that business conduct is 'not related to any apparent efficiency' may constitute proof of specific intent to monopolize." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (quoting *Aspen Skiing*, 472 U.S. at 608 n.39). These allegations take the form of the previously mentioned "other anticompetitive conduct" such as unnecessary audits, unfair steering, and inefficient procedure codes meant to "raise [independent physician's] costs" and "divert[] resources away from providing" patient care. Dkt. No. 42 at ¶ 50. These practices, according to the amended complaint, were intended to "reap supra-competitive profits" for Highmark, "entrench its own market power in the outpatient physician services market and private health insurance market," and force independent physicians to either join Highmark or go out of business. *Id.* at ¶ 44, 48. For example, the amended complaint charges specific conduct as "pretextual," such as audits that

have "no medically-related or other legitimate basis." *Id.* at ¶ 50. Further, the amended complaint alleges that Highmark's procedure codes "result in gross inefficiencies" motivated by "forc[ing] Presque Isle, a competitor, to spend more time on less efficacious treatments on the hope that patients will become frustrated and switch" care providers. *Id.* at ¶ 51. These pleadings are sufficient to establish the intent element under *Iqbal*'s standards. *See Iqbal*, 556 U.S. at 678.

3.  *Counts 2 and 4: Unlawful Monopsonization and Unlawful Attempted Monopsonization in Violation of Pennsylvania Common Law*

Highmark advances no independent grounds for dismissal of Plaintiff's Pennsylvania common law antitrust causes of action. Instead, Highmark's motion to dismiss merely contends that, if the Court dismisses Plaintiff's causes of action under the Sherman Antitrust Act, "it must also dismiss" the common law claims "which are based on identical allegations." Dkt. 47 at 6 n.2 (citing *InterVest*, 340 F.3d at 158 n.8; *Alvord-Polk*, 37 F.3d at 1014). Plaintiff concedes that the elements necessary to plead a Pennsylvania common law antitrust claim are "substantially similar" to its federal claims. Dkt. 48 at 12 n.2.

This, however, is not the full picture. "Pennsylvania has no general antitrust statute, nor any statute creating a private right of action against restraints of trade." *In re K-Dur Antitrust Litig.*, No. 01-1652, 2008 WL 2660778, at *3 (D.N.J. Feb. 25, 2008). In fact, the Pennsylvania courts that have examined the issue have expressly concluded that no private remedy for damages is available under Pennsylvania law. *XF Enterprises, Inc. v. BASF Corp.*, 47 Pa. D. & C.4th 147, 149–51 (Ps. Com. Pl. 2000) ("[w]ithout legislation similar to the Sherman Act's, Pennsylvania common law lacks the damage provision necessary to give Pennsylvanians the cause of action which plaintiff seeks here"); *see also Stutzle v. Rhone-Poulenc S.A.*, No. 002768 Oct. Term 2002, 2003 WL 22250424, at *1 (Pa. Com. Pl. Sept. 26, 2003) ("[t]o date, no court in

Pennsylvania has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations"). Numerous federal courts have followed this guidance, disallowing claims for damages under Pennsylvania common law for antitrust violations to proceed. *See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 710 (E.D. Pa. 2014); *In re K-Dur Antitrust Litig.*, 2008 WL 2660780, at *4; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1131 (N.D. Cal. 2008); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 905–06 (N.D. Cal. 2008).

Plaintiff's complaint does seek injunctive relief. Dkt. No. 42 at ¶¶ 99, 117. As such, the Court grants Highmark's motion to dismiss Plaintiff's Pennsylvania common law antitrust claims, counts 2 and 4, so far as it seeks damages but not so far as it seeks injunctive relief. *See Alarmax Distributors, Inc. v. Tyco Safety Prod. Canada Ltd.*, No. 7-1744, 2008 WL 2622899, at *4 (W.D. Pa. June 27, 2008) (declining to dismiss claim asserted under Pennsylvania law where Plaintiff sought only injunctive relief).

## C. Section 1 of the Sherman Antitrust Act

Similar in structure to its Section 2 claims, Plaintiff advances causes of action for unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act in counts five and seven and Pennsylvania common law in counts six and eight. Dkt. No. 42 at ¶¶ 118–153. All four causes of action rest on a theory of unlawful tying, *i.e.*, that Highmark violated antitrust laws by "unlawfully tying the reimbursement of outpatient physician services . . . under any of its health insurance products to the reimbursement of the same under any of its other health insurance products." *Id.* at ¶¶ 119, 128, 137, 146. Highmark seeks to dismiss all four causes of action for the simple reason that there is no precedent to assert a tying theory against an alleged

monopsonist. Dkt. 47 at 18 ("Plaintiff has to date failed to identify any cases in which the court found that a contract between a plaintiff and a defendant can form the basis of a buy-side tying claim.").

Section 1 of the Sherman Antitrust Act outlaws "[e]very contract ... in restraint of [interstate or international] trade or commerce." 15 U.S.C. § 1. Tying, in turn, is the practice of "selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 213 (3d Cir. 2005) (citing *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir.), *cert. denied*, 506 U.S. 868 (1992)). There are two theories under which to prove an illegal tying agreement; *per se* and the rule of reason. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998).

A plaintiff may establish a *per se* claim by showing that "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." *Town Sound & Custom Tops,* 959 F.2d at 477; *see also Gordon*, 423 F.3d at 214. If a plaintiff can make such a showing, "then the defendant's tying practices are automatically illegal without further proof of anticompetitive effect." *Town Sound & Custom Tops*, 959 F.2d at 477. If, however, a plaintiff cannot make such a showing, the plaintiff may still establish an illegal tying agreement by demonstrating that the agreement violated the "rule of reason," by showing that the tying agreement "unreasonably restrained competition." *Brokerage Concepts*, 140 F.3d at 519 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984) ("*Jefferson Parish*")).

The Court need not, however, proceed to the substantive requirements of a prima facia case, because the principals underlying a tying claim's illegality do not extend from the

established case of a monopolist to a monopsonist. "The law is well developed as to when tying arrangements should give rise to liability under the Sherman Act." *Brokerage Concepts*, 140 F.3d at 511. Elaborations on the underlying principle for the illegality of tying agreements consistently emphasize concerns over sellers' market power, not buyers. *See, e.g.*, *Jefferson Parish*, 466 U.S. at 13–14 (1984) ("we have condemned tying arrangements when the *seller* has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) ("the essence of illegality in tying agreements is the wielding of *monopolistic* leverage; a *seller* exploits his dominant position in one market to expand his empire into the next"); *Gordon*, 423 F.3d at 214 ("[t]he essential characteristic of a tying arrangement lies in the *seller's* exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms"); *Brokerage* Concepts, 140 F.3d at 510 ("[t]he antitrust concern over tying arrangements arises when the *seller* can exploit its market power in the tying market to force buyers to purchase the tied product which they otherwise would not, thereby restraining competition in the tied product market"); *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 200 (3d Cir. 1994) ("the antitrust concern over tying arrangements is *limited to those situations* in which the *seller* can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market"); *Town Sound & Custom Tops*, 959 F.2d at 475 ("[t]he cases thus reveal a concern that a *monopolist* in the tying product market may use that leverage to garner sales in a second market, thereby foreclosing competitors and monopolizing the formerly competitive tied product market too") (emphasis added to all).

As Highmark points out, tying arrangements raise antitrust concerns among courts for three prominent reasons. Dkt. No. 47 at 18–20. First, such agreements foreclose markets to competitors. *See e.g., N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958) ("[t]hey deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market"). Second, they create barriers to entry for new entrants. *See, e.g., Town Sound & Custom Tops*, 959 F.2d at 475 ("the arrangement may raise barriers to entry to the tied product market because new entrants would have to sell both tied and tying products to compete"). Finally, tying arrangements are a concern because, quite simply, they force consumers to buy a product they do not want, offending free will and distorting demand. *See, e.g., N. Pac. Ry. Co.*, 356 U.S. at 6 ("buyers are forced to forego their free choice between competing products"); *Jefferson Parish*, 466 U.S. at 12 ("[w]hen such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated"). Plaintiff does not refute this underlying logic. *See, generally*, Dkt. No. 48 at 17–20.

As Highmark points out, Plaintiff is unable to identify a case in which a court extended tying liability to a monopsonist. Dkt. No. 47 at 18. The Court is also unable to find such a case. As such, the Court will dismiss Plaintiff's amended unlawful restraint of trade counts of action under violation of Section 1 of the Sherman Antitrust Act and Pennsylvania common law without leave to amend.

**D. *Parker* State Action Doctrine**

In the event that the Court declined to dismiss some or all of the Plaintiff's antitrust claims, as it has, Highmark contends it is "insulated from antitrust liability by the [*Parker*] state action doctrine." Dkt. No. 47 at 21. The *Parker* doctrine descends from *Parker v. Brown*, 317

U.S. 341 (1943), in which the Supreme Court held that States are immune from antitrust liability because the purpose of the Sherman Antitrust Act "was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations" and gave "no hint" that it was intended to "restrain state action or official action directed by a state." *Id.* at 351; *see also Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572–73 (3d Cir. 2017). The underlying justification rests on "principles of federalism and state sovereignty," *Hoover v. Ronwin*, 466 U.S. 558, 567 (1984), recognizing that "[a]ntitrust laws do not bar anticompetitive restraints that sovereign states impose "as an act of government,'" *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 254 (3d Cir. 2001) (quoting *Parker*, 317 U.S. at 352).

Highmark claims, in essence, that the Commonwealth of Pennsylvania effectively inoculated any of Highmark's alleged anticompetitive conduct through approval of the PPA[13] and the All Products Clause contained therein. Under Pennsylvania administrative code, health insurers, such as Highmark, are required to "submit the standard form of each type of health care provider contract," such as the PPA, and any "material change or amendment" thereafter, to the Pennsylvania Department of Health ("DOH"). 28 Pa. Code § 9.722(a)–(b). Highmark submits, as Exhibit A to the Declaration of Attorney William J. Sheridan, the August 26, 2009 DOH correspondence approving the PPA presently at issue. Dkt. No. 47-2.[14] Through DOH's

---

[13] The "Professional (or Participating or Preferred) Provider Agreement," which is the standard form contract governing the relations between the parties. *See supra* at 4.

[14] The parties disagree as to whether the Court may consider Exhibit A. *Compare* Dkt. No. 48 at 24 n.7 (Plaintiff arguing that the Court should "strike or disregard" the Exhibit because "[a] court may not consider materials outside the pleadings on a Rule 12(b)(6) motion") (citing *Pension Benefit Guar. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); FED. R. EVID. 201(b)) *with* Dkt. No. 49 at 9 n.6 (Defendants arguing that the Court may consider Exhibit A "because it is a matter of public record") (citing *Pension Benefit Guar.*, 998 F.2d at 1197). The Court finds that it may consider Exhibit A as a "matter of public record." *See Pension Benefit Guar.*, 998 F.2d at 1197) ("Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include . . . letter decisions of government agencies.").

approval, Highmark asserts, "any allegedly anticompetitive terms in the PPA are immune from antitrust liability." Dkt. No. 47 at 24.

Plaintiff contests the applicability of the *Parker* doctrine to this case. In its opposition, Plaintiff in essence argues that Highmark's *Parker* contentions are both too broad and too deep. First, Plaintiff claims that its allegations of antitrust conduct extend beyond the PPA and the All Products Clause. *See* Dkt. No. 48 at 21. Thus, Highmark's invocation of the *Parker* doctrine sweeps too broadly in attempting to immunize all of Highmark's alleged anticompetitive actions simply through the State's approval of the PPA. Second, Plaintiff claims that Highmark extends the *Parker* doctrine too deeply, attempting to expand a simple ministerial approval into an expression of state policy approving anticompetitive conduct. *See id.* at 22–24. In this instance, Plaintiff's arguments carry the day.

In order to invoke the protections of the *Parker* doctrine in this instance, Highmark must pass a "rigorous" two-part test: "[f]irst, the state must enact a 'clearly articulated and affirmatively expressed' policy permitting anticompetitive conduct; and second, the State must 'actively supervise[ ]' that conduct." *Edinboro Coll. Park Apartments*, 850 F.3d at 573 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)).[15] Highmark bears the burden of establishing this affirmative defense. *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1266 (3d Cir. 1994) (listing cases).

---

[15] The Supreme Court has devised "three approaches" to analyzing a *Parker* doctrine defense: "(1) ipso facto immunity, (2) *Midcal* scrutiny, and (3) *Hallie* scrutiny." *Edinboro Coll. Park Apartments*, 850 F.3d at 572 (referencing *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) and *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985)). Which applies is determined by whether the "relevant actor" is "comparable to a sovereign power, a private business, or something in between." *Id.* at 572. Here, both parties utilize the *Midcal* standard. *See* Dkt. No. 47 at 22; Dkt. No. 48 at 21 (citing to *Edinboro Coll. Park Apartments*, 850 F.3d 567). This is the correct standard as "*Midcal* analysis applies where private actors seek to immunize their anticompetitive conduct under the *Parker* doctrine" and Highmark is a private actor. *Edinboro Coll. Park Apartments*, 850 F.3d at 573 (citing *Midcal*, 445 U.S. at 106).

As to the first prong, that of "clearly articulated and affirmatively expressed," "[i]t is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Midcal Aluminum*, 445 U.S. at 104 (quoting *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791 (1975)). Further, "*Midcal* confirm[ed]" that States could not "confer antitrust immunity on private persons by fiat." *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992). Instead, competition may only be displaced "if the displacement is both intended by the State and implemented in its specific details." *Id.* "State-action immunity is disfavored," *id.* at 636, and thus is applicable "only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that 'is the State's own,'" *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013) (quoting *Ticor Title Ins.*, 504 U.S. at 635). While it is true that "[i]t is not necessary . . . for the state legislature to have stated explicitly" within the statute that it intended to displace competition, *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42 (1985) ("*Hallie*"), the anticompetitive effect must be the "'foreseeable result' of the state's authorization." *Edinboro Coll. Park Apartments*, 850 F.3d at 580 (quoting *Hallie*, 471 U.S. at 41).

Regarding the second prong, "active supervision," the inquiry is whether the State has "exercised sufficient independent judgment and control" to establish that the anticompetitive conduct was sanctioned "as a product of deliberate state intervention." *Ticor Title Ins. Co.*, 504 U.S. at 634–35. "The active supervision requirement stems," after all, "from the recognition that '[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.'" *Patrick v. Burget*, 486 U.S. 94, 100 (1988) (quoting *Hallie*, 471 U.S. at 47). Through "active

supervision," then, States may ensure that only conduct that "actually further[s] state regulatory policies," as compared to the interests of the private party, are protected. *Id.* at 101.

With these principles in mind, Highmark's appeal to the *Parker* doctrine is unavailing for two independent reasons. First, Highmark is incorrect that all of Plaintiff's alleged harms flow from the All Products Clause and the PPA, the state approval of which provides the basis for its invocation of the *Parker* doctrine. *See* Dkt. No. 47 at 21. As Plaintiff replies, "[t]he all products clause is but one aspect of Highmark's anticompetitive behavior." Dkt. 48 at 20. As previously discussed, Plaintiff's amended complaint alleges other anticompetitive conduct, which the Court considered to determine whether Plaintiff had met the pleading requirements to establish anticompetitive conduct. *See supra* at 12–16. Plaintiff's amended complaint characterizes the All Products clause as an exacerbating factor, not a sole factor. *See, e.g.* Dkt. No. 42 at ¶ 13. There is no indication in the Pennsylvania administrative code, or Exhibit A, that Pennsylvania approved of Plaintiff's alleged other anticompetitive conduct or the reduced rates of primary concern to Plaintiff. As such, Highmark has failed to make a prima facia showing that the *Parker* doctrine is broadly applicable to all the alleged conduct.

Second, Highmark fails to meet the substantive requirements of the *Midcal* standard. Quite simply, Highmark overstates the extent of Pennsylvania's approval of its actions through submission and review of the draft PPA. For example, Section 9.722 contains no indication that the DOH reviews for antitrust concerns, let alone expresses a "clearly articulated and affirmatively expressed" state policy to permit anticompetitive conduct. *See generally* 28 Pa. Code § 9.722. To the contrary, DOH's affirmative obligations evidence a concern for consumer protection, for example by (1) prohibiting retaliatory clauses against healthcare providers who "[a]dvocate for medically necessary and appropriate health care services for an enrollee" or who

file grievances on behalf of an enrollee, *id.* at § 9.722(c), and (2) requiring certain consumer protection provisions, for example, "[l]anguage stating that enrollee records shall be kept confidential by the plan and the health care provider," *id.* at § 9.722(e). There is simply no evidence in the statute of antitrust concerns and, as Plaintiff points out, Highmark "cannot and does not point to any Pennsylvania legislative decree empowering Highmark to act anticompetitively." Dkt. No. 48 at 22.

Nor does the submission of annual and quarterly reports, as required by 28 Pa. Code § 9.604 and pointed to by Highmark, *see* Dkt. No. 47 at 23–24, prove "active supervision" where, again, the provision evidences no condoning of anticompetitive activity. Nothing within either texts provides evidence of a policy approving all the possible negative ramifications that may arise from the contract or inoculating plans from federal antitrust scrutiny.

Exhibit A is similarly unavailing. It evidences nothing more than that DOH "reviewed the changes" to the most recent PPA and had "no objections to them." Dkt. 47-2 at 2. Again, there is no indication that DOH, in its review, was concerned with, or even reviewed for, anticompetitive conduct let alone that Pennsylvania asserted an affirmative policy to condone such conduct. The letter is evidence of nothing more than a ministerial approval and, as the Supreme Court has made clear, "'simple permission to play in a market' does not 'foreseeably entail permission to roughhouse in that market unlawfully.'" *Phoebe Putney Health Sys.*, 568 U.S. at 231 (quoting *Kay Elec. Cooperative v. Newkirk*, 647 F.3d 1039, 1043 (10th Cir. 2011)). As such, Highmark's invocation of the *Parker* doctrine is unavailing, and Plaintiff's surviving antitrust claims may proceed.

## E. Count Nine: Unjust Enrichment

Having determined that at least some of Plaintiff's antitrust causes of action may stand, the Court will address the pendant common law causes of action. The first of which, in count nine, is Plaintiff's claim of unjust enrichment based on the allegation that Highmark "knowingly received and retained wrongful benefits . . . in the form of [] the difference in the amount of the reimbursement rates and claw-back 'audits'" as well as "other wrongfully held amounts." Dkt. No. 42 at ¶ 155.

Highmark moves to dismiss this cause of action based on the contention that "'[a] cause of action for unjust enrichment may arise only when a transaction of the parties [is] not otherwise governed by an express contract.'" Dkt. No. 47 at 24 (quoting *Villoresi v. Femminella*, 856 A.2d 78, 84 (Pa. Super. Ct. 2004)). As the PPA governs the relationship between the parties, Highmark argues this cause of action should be dismissed.

Plaintiff responds by pointing out that Highmark has not challenged the sufficiency of Plaintiff's pleading of the necessary elements of an unjust enrichment claim, but rather whether such a claim may advance in the face of the PPA. Plaintiff cites a similarly situated recent Eleventh Circuit case and also argues that it may plead unjust enrichment in the alternative, under on FED. R. CIV. PRO. 8(d)(3), based on the Court's earlier suggestion in the September Order that the PPA might not cover all of Highmark's health insurance products. *See* Dkt. No. 35 at 6 n.8.

The Court is persuaded that Highmark is correct. First, as Highmark points out, under both Third Circuit precedent and Pennsylvania law unjust enrichment is inapposite where a valid contract exists. *See Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 169–70 (3d Cir. 2014) ("'the doctrine of unjust enrichment is inapplicable when the relationship between parties is

founded upon a written agreement or express contract'") (quoting *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006)). Nowhere in its complaint or subsequent pleadings has Plaintiff claimed that the PPA is invalid. *See generally* Dkt. No. 42.

Plaintiff's sole precedential support is unavailing. It points to only one out-of-Circuit case, *Quality Auto Painting Ctr. Of Roselle, Inc. v. v. State Farm Indem. Co.*, 870 F.3d. 1262 (11th Cir. 2017), for the proposition that "the existence of the PPA does not extinguish" its unjust enrichment claim. Dkt. No. 48 at 28. That case, however, rested its conclusion on an assumption that a valid contract did not exist between the parties. *See Quality Auto Painting Ctr. of Roselle*, 870 F.3d at 1277 ("[a]ssuming the truth of the allegations and drawing inferences in favor of the [Plaintiffs], the [Defendants] forced the [Plaintiffs] to perform repairs, and any dealing between the [Plaintiffs] and the [Defendants] was based on an invalid, unenforceable contract"). Here, however, we have an unchallenged, valid agreement between the parties.[16]

As for Plaintiff's contention that it may plead unjust enrichment in the alternative based on the Court's observation in the September Order that the PPA might not cover all of Highmark's health insurance products, it has been overtaken by subsequent pleadings. In its amended complaint, Plaintiff now pleads that "Highmark applies the PPA to *all of its products, including those that were not extant at the time an independent physician might have signed it*." Dkt. No. 42 at ¶ 16 (emphasis added). As such, the Court is now persuaded that the PPA, and the All Products Clause, covers the entirety of Highmark's health insurance products and relationship with Plaintiff. As such, Plaintiff's claim for unjust enrichment is futile given the

---

[16] Even more fatal to Plaintiff's argument, however, is the fact that the Eleventh Circuit, sitting en banc, subsequently reversed this very holding on this very point, albeit after Plaintiff filed its memorandum in opposition to Highmark's motion to dismiss. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1272–73 (11th Cir. 2019) (en banc) ("[Plaintiffs] cite no law—in any of the four states—to the effect that market power alone is sufficient to invalidate a contract voluntarily entered into").

existence of the PPA and the lack of contention that it is invalid or does not control. *See Gorecki v. Clearview Elec., Inc.*, 338 F. Supp. 3d 470, 476 (W.D. Pa. 2018) ("[a] claim for unjust enrichment may be pleaded in the alternative to other contract claims, but 'such alternative pleading is plausible only when the validity of the contract is itself actually disputed, making unjust enrichment a potentially available remedy'") (quoting *Grudkowski*, 556 F. App'x at 170 n.8).

The Court therefore will dismiss Plaintiff's cause of action for unjust enrichment with prejudice.

**F.  Count Ten: Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

Plaintiff pleads its claim for breach of contract and breach of implied covenant of good faith and fair dealing in one count.  As the parties have argued separate theories for dismissing or maintaining these separate grounds, the Court will address them in turn.

*1.  Breach of Contract*

Plaintiff does not allege a breach of the terms of the PPA itself.  Instead, the amended complaint accuses Highmark of violating the ACA's antidiscrimination provision,[17] which the PPA in turn incorporates by reference.[18]  *See* Dkt. No. 42 at ¶ 164–68.  "By discriminating in

---

[17] The ACA provides: "A group health plan and a health insurance issuer offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law. This section shall not require that a group health plan or health insurance issuer contract with any health care provider willing to abide by the terms and conditions for participation established by the plan or issuer. Nothing in this section shall be construed as preventing a group health plan, a health insurance issuer, or the Secretary from establishing varying reimbursement rates based on quality or performance measures." 42 U.S.C.A. § 300gg-5; *see also* Dkt. No. 42 at ¶ 165.

[18] The PPA provides: "Provider and [Keystone Health Plan West] agree to operate, and perform their obligations under this Agreement, in accordance with all applicable Laws." Dkt. No. 42-1 at § 7.1.  The definition section then defines "Laws" to include "any applicable foreign, United States, federal, state and/or local constitution, treaty, statute, regulation, rule, code, ordinance, order, policy, directive, injunction, writ, decree, award or the like of any Official Body that is in effect." Dkt. No. 42-1 at Att. 1, § 2.Q.

reimbursement rates on a basis other than quality of care," alleges Plaintiff, "Highmark has materially, continuously breached" the PPA. *Id.* at ¶ 168.

While Highmark contests whether it materially violated the provisions of the ACA, Highmark chiefly argues that Plaintiff cannot assert a breach of action claim under Pennsylvania law based on the incorporation of a statute which gives Plaintiff no private right of action. Dkt. No. 47 at 25. Plaintiff disagrees based on the substance and understanding of Pennsylvania law and the ACA. *See* Dkt. No. 48 at 25–6.

The Court finds *Petty v. Hosp. Serv. Ass'n of Ne. Pennsylvania*, 23 A.3d 1004 (Pa. 2011) persuasive and controlling for the proposition that Plaintiff cannot assert a claim for breach of contract in this instance. In *Petty*, Pennsylvania's Supreme Court set out to determine whether an employer could assert a breach of contract claim against a nonprofit hospital corporation that contracted to provide health insurance coverage to the employer's employees. *Id.* at 123. Employer first sought to hold insurer liable under Pennsylvania's Nonprofit Law, 15 PA. STAT. AND CONS. STAT. ANN. § 5545, but the Court held that Plaintiff did not have standing based on the Law's statutorily prescribed limitation on standing. *Id.* at 133; *see also* 15 PA. STAT. AND CONS. STAT. ANN. § 5793(a).

In turn, employer pled a breach of contract claim alleging a violation of the parties' contractual relation based on the incorporation by reference of the Nonprofit Law. *Petty*, 23 A.3d at 123, 133–34. The Pennsylvania Supreme Court, however, held that employer did not have standing to assert such a claim because, in essence, "a party cannot do indirectly what it cannot do directly" or, in other words, the employer could not "base a breach of contract claim on an alleged Nonprofit Law violation when the Nonprofit Law does not provide for a private cause of action." *Id.* at 134; *see also id.* at 136 ("we cannot, in this case, permit appellants to do

under common law what they are clearly prohibited from doing under statute . . . and hold appellants lack standing to maintain their breach of contract claim").

Plaintiff points to *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652 (Pa. 2009), to counter the foregoing conclusion by arguing that *Liss* stands for the proposition that the Pennsylvania Supreme Court permitted a "breach of contract claim to proceed based on excess rates charged for copies of electronic records even though [the] statute setting rates does not create a private right of action." Dkt. No. 48 at 25. Additionally, Plaintiff attempts to distinguish *Petty* by asserting that "[t]he *Petty* court expressly distinguished the Nonprofit Law from the statute at issue in *Liss*." *Id.* at 26.

The problem with Plaintiff's argument is that it is incorrect in its assertion that "the ACA lacks any limit on who can sue under it." Dkt. No. 48 at 26. There is fair consensus that the ACA's antidiscrimination provision, 42 U.S.C. § 300gg-5, does not create a private right of action. *See A.Z. by & through E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1082–83 (W.D. Wash. 2018); *Vorpahl v. Harvard Pilgrim Health Ins. Co.*, No. 17-0844, 2018 WL 3518511, at *5 (D. Mass. July 20, 2018); *Ass'n of New Jersey v. Horizon Healthcare Servs., Inc.*, No. 16-08400, 2017 WL 2560350, at *3–*5 (D.N.J. June 13, 2017); *Dominion Pathology Labs., P.C. v. Anthem Health Plans of Virginia, Inc.*, 111 F. Supp. 3d 731, 736 (E.D. Va. 2015). Further still, as Highmark points out, the ACA expressly provides that only the States and secondarily the Secretary of the Department of Health and Human Services may enforce the antidiscrimination provision. 42 U.S.C. § 300gg-22. It is therefore not silent on the issue of enforcement, it determines precisely who may and may not sue to enforce its provisions.

*Liss* is distinguishable from the present circumstance. In *Liss* the incorporated statute, the Medical Records Act ("MRA"), 42 Pa. Stat. and Cons. Stat. Ann. § 6152 *et seq.*, provided no

"evidence [of] legislative intent to limit Appellee's common law rights or preempt common law causes of action" and "the legislature did not provide any mechanism or procedure for the resolution of disputes." *Liss*, 983 A.2d at 660. Thus, as distinguishable from the ACA's antidiscrimination provision, the MRA was a blank slate as to enforcement, whereas the ACA affirmatively does not support a suit by Plaintiff. *Petty* explicitly distinguished *Liss* on this point. As the Court in *Petty* stated, "whereas in *Liss* the legislature intended for the appellants to be subject to the MRA's pricing limits and provided no limitation as to who could raise that challenge, the Nonprofit Act's plain language indicates the legislature did not intend for general consumers to challenge corporate actions in a court of law." *Petty*, 23 A.3d at 1014. Thus, under Pennsylvania law, Plaintiff does not have standing to assert a breach of contract claim based on the ACA, where it could not enforce its rights directly through the ACA.

   2. *Covenant of Good Faith and Fair Dealing*

   The Court, however, will not dismiss this count to the extent that Plaintiff alleges a violation of the covenant of good faith and fair dealing. "Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Donahue v. Fed. Exp. Corp.*, 753 A.2d 238, 242 (Pa. 2000). Highmark, according to Plaintiff, violated that duty by unilaterally imposing discriminatory reimbursement rate cuts and engaging in other unfair, anticompetitive conduct." Dkt. 42 at ¶ 169. Highmark counters that "[t]o the extent that Plaintiff purports to base its claim" for breach of fiduciary duty on such allegations, dismissal is appropriate because, under Pennsylvania law, such claims must be based on a specific provision of a contract. Dkt. No. 47 at 26 n.8.

   Plaintiff's however, can point to such a provision, the variable reimbursement rate clause, which provides that "allowances [paid to specialist] may be reviewed and adjusted from time to

time during the Term." Dkt. No. 42-1 at Att. 6.1 § 4.2. Thus, Plaintiff contends that "[e]ven if the PPA affords Highmark the discretion to pay whatever rates it chooses, Highmark still has a duty to exercise its discretion in good faith." Dkt. No. 48 at 27.

Under Pennsylvania law, a duty of good faith "is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). Instead, the duty is defined as "[h]onesty in fact in the conduct or transaction concerned." *Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Tr. Co.*, 560 A.2d 151, 153 (Pa. Super. Ct. 1989) (quoting 13 PA. STAT. AND CONS. STAT. ANN. § 1201). "[C]ourts generally utilize the good faith duty as an interpretive tool to determine 'the parties' justifiable expectations,' and do not enforce an independent duty divorced from the specific clauses of the contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir. 1995) (internal citation removed). As the Pennsylvania Court of Common pleas has stated, after confessing that the duty is "shrouded in mystery and confusion in Pennsylvania," the duty "does *not* allow for a claim separate and distinct from a breach of contract claim" but rather "a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself." *JHE, Inc. v. Se. Pennsylvania Transp. Auth.*, No. 1790 Nov. Term 2001, 2002 WL 1018941, at *5 (Pa. Com. Pl. May 17, 2002) (emphasis in original).

Pennsylvania Courts have recognized that it is not possible to classify every situation constituting a breach of the duty, but have instead determined that examples include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in

the other party's performance." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992);

*see also Phila. Plaza-Phase II v. Bank of Am. Nat. Tr. & Sav. Ass'n*, No. 3745 Apr. Term 2002,

2002 WL 1472337, at *6 (Pa. Com. Pl. June 21, 2002). Relevantly, "[t]he covenant of good faith

may also be breached when a party exercises discretion authorized in a contract in an

unreasonable way." *Phila. Plaza-Phase II*, 2002 WL 1472337, at *6 (citing *Burke v. Daughters*

*of the Most Holy Redeemer, Inc.*, 26 A.2d 460, 461 (Pa. 1942)).

Thus, Plaintiff's breach of contract and implied covenant of good faith and fair dealing

may survive to the extent that Plaintiff alleges that Highmark exercised its contractual rights

under the variable rates clause in violation of its duty of good faith but not to the extent that

either (1) it violated the terms of the PPA by exercising its right to adjust rates in the first place

or (2) by adjusting rates it violated the antidiscrimination provision of the ACA.

## G. Count Eleven: Reformation and Rescission

Plaintiff's final cause of action is for "reformation or recession." Dkt. No. 42 at ¶¶ 172–

80. Through this count, Plaintiff pleads that the PPA "should either be reformed or partially

rescinded" based on the contention that "[c]onsent" by Plaintiff and other class members was not

"real or free, and/or was given under force, coercion, and/or without consent or mutual material

consideration." *Id.* at ¶ 173–74. The root of this allegation is that the PPA and its terms,

including the All Product Clause, "were not fully disclosed" by Highmark or that they were

"confusing" and contained "abstruse conditions or terminology." *Id.* at ¶ 175–76.

Highmark contends that this count should be dismissed because "reformation or

rescission" is not a separate cause of action but, instead, constitutes a remedy provided for a

breach of contract. Dkt. No. 47 at 26. Plaintiff disagrees on the substance of Pennsylvania law.

Dkt. No. 48 at 27–28.

Thus, the Court must determine whether "reformation or recession" constitute a distinct cause of action under Pennsylvania law. The Court concludes it does. Plaintiff in its reply brief provides several examples of "claims" or "actions" in equity for "reformation" or "recession." Dkt. No. 48 at 27; *see, e.g., Keenheel v. Com., Pennsylvania Sec. Comm'n*, 565 A.2d 1147, 1148 (Pa. 1989) (appellant "commenced this action seeking equitable rescission of the settlement agreement"); *Line Lexington Lumber & Millwork Co. v. Pennsylvania Pub. Corp.*, 301 A.2d 684, 685 (Pa. 1973) ("[a]ppellant contends that his amended complaint stated a cause of action for reformation of contract. We agree and reverse the order below.); *Murray v. Willistown Twp.*, 169 A.3d 84, 90 (Pa. Super. Ct. 2017) ("[b]oth parties agree that contract reformation is an appropriate equitable remedy in this case: the Township sought such reformation in its complaint"); *Baltimore v. Freed*, No. 330 C.D. 2014, 2014 WL 10298875, at *1 (Pa. Commw. Ct. Nov. 5, 2014) ("[t]his appeal arises out of a dispute whereby neighboring property owners, Terry and Soni Baltimore (Baltimores), sought reformation of a quitclaim deed."). In fact, one of Highmark's cited cases lends credence to this conclusion. *See Moffatt Enterprises, Inc. v. Borden Inc.*, 807 F.2d 1169, 1174 (3d Cir. 1986) ("Under Pennsylvania law, a defrauded party may *pursue* several remedies including *an action* of damages for deceit, *recission* and restitution based on fraud, and *reformation* of the contract for fraud.") (Emphasis added). As such, the Court determines that such an action exists under Pennsylvania law.

Alternatively, Highmark claims that Plaintiff's "purported claim for reformation or rescission" should be dismissed because under Pennsylvania law "those equitable remedies are appropriate only where there has been a showing of fraud, accident, or mistake." Dkt. No. 47 at 27 n.9. Here, Highmark is correct on the law. *See Moffatt Enterprises*, 807 F.2d at 1174 ("[u]nder Pennsylvania law, a *defrauded* party may pursue several remedies including an action

of damages for deceit, recission and restitution *based on fraud*, and reformation of the contract for *fraud*") (emphasis added); *Clark v. Allstate Ins. Co.*, No. 10-294, 2010 WL 1904013, at *2 (W.D. Pa. May 7, 2010) ("rescission is an equitable remedy that a court may grant when an insurer proves fraud by the insured in obtaining the policy"); *Kutsenkow v. Kutsenkow*, 202 A.2d 68, 68–69 (Pa. 1964) ("[i]t has long been the law that courts of equity have the power to reform a written instrument where there has been a showing of fraud, accident or mistake"); *Overmiller v. Town & Vill. Ins. Serv.*, 21 A.2d 411, 412 (Pa. Super. Ct. 1941) (stating that courts sitting in equity have the power to "direct and to enforce the surrender and cancellation of written instruments for due cause" and "due cause" includes fraud) (internal quotations removed); *Penn Park, Inc. v. Falls Twp. Auth.*, 51 Pa. D. & C.2d 360, 363 (Pa. Com. Pl. 1970) ("[t]his power of a court of equity will be exercised only in clear cases and only where there is a showing of fraud, mistake or lack of consideration").

Plaintiff has pled sufficient fraud or misrepresentation in its amended complaint to survive a 12(b)(6) challenge. As quoted earlier, Plaintiff alleges that the terms of the PAA were not "fully disclosed" or that "Plaintiff and other Class members were forced or induced to enter into a PPA insofar as Highmark coercively required and/or omitted the full terms or actual arrangement concerning reimbursement." Dkt. No. 42 at ¶¶ 175, 177. Accepting all factual allegations as true and construing the amended complaint in the light most favorable to the Plaintiff, the Court finds these allegations sufficient to satisfy *Iqbal*'s standards. See *Iqbal*, 556 U.S. at 678.

## V.    CONCLUSION

For the forgoing reasons, the Court ORDERS as follows:

*1.* Defendants' motion to dismiss [47] is DENIED as to counts 1 and 3.

2.  Defendants' motion to dismiss [47] is DENIED as to counts 2 and 4, to the extent that
    Plaintiff seeks only injunctive relief.

3.  Defendants' motion to dismiss [47] is GRANTED as to counts 5, 6, 7, and 8. Counts
    5, 6, 7, and 8 are DISMISSED WITH PREJUDICE.

4.  Defendants' motion to dismiss [47] is GRANTED as to count 9. Count 9 is
    DISMISSED WITH PREJUDICE.

5.  Defendants' motion to dismiss [47] is GRANTED in part and DENIED in part as to
    count 10.

6.  Defendants' motion to dismiss [47] is DENIED as to count 11.

**IT IS SO ORDERED**.

DATED this day 22nd of _July_ , 2019.


BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE